Thomas E. Loeser (SBN 202724)
tloeser@cpmlegal.com
**COTCHETT PITRE & MCCARTHY, LLP**
2716 Ocean Park Blvd, Suite 3088
Santa Monica, CA 90405
T: (310) 392-2008

Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
T: (310) 474-9111

*Co-Lead Interim Class Counsel*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DISIVISON

| | |
|---|---|
| *In re Farmers Security Incident Litigation* | Case No. 2:25-cv-07972-MWF-AYP |
| | Hon. Michael W. Fitzgerald, presiding |
| This Document Relates To: All Actions | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| | ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF |
| | JURY TRIAL DEMANDED |

CONSOLIDATED CLASS ACTION COMPLAINT

# **TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................ 1

II.    PARTIES ................................................................................................... 3

       A.    Plaintiffs........................................................................................ 3

       B.    Defendants .................................................................................... 3

III.   JURISDICTION AND VENUE ................................................................. 6

IV.    FACTUAL ALLEGATIONS ..................................................................... 7

       A.    Defendants Collect, Store, Use, and Share Plaintiffs' and Class
             Members' Private Information. .................................................... 7

       B.    Defendants Promise to Protect Plaintiffs' and Class Members' Private
             Information. ................................................................................... 9

       C.    The Data Breach. ........................................................................ 10

       D.    The Data Breach Was a Foreseeable Result of Defendants' Data
             Security Failures. ....................................................................... 14

       E.    Defendants Knew They Were at High Risk for a Data Breach. ............... 15

       F.    Defendants Failed to Implement Sufficient Security Measures to
             Prevent a Data Breach. .............................................................. 17

       G.    The Private Information Is or Will Be Published on the Dark Web......... 20

       H.    The Data Breach Significantly Harms Victims. ...................................... 21

       I.    Victims of Data Breaches Must Expend Time and Money to Mitigate
             Their Risk of Harm. ................................................................... 25

       J.    The Data Breach Caused Plaintiffs and the Class Demonstrable Harm... 28

       K.    Defendants Failed to Follow Industry Standards for Data Security......... 29

             1.    Defendants Failed to Comply with FTC Guidelines. .................... 30

             2.    Defendants Failed to Comply with Industry Standards. ............... 32

             3.    Defendants Breached Their Duty to Safeguard Plaintiffs' and
                   Class Members' Private Information. ....................................... 35

       L.    Plaintiffs and Class Members Suffered Injury ........................................ 36

V.    ALLEGATIONS RELATING TO PLAINTIFFS ............................................... 40

    A.    Plaintiff Michael McCulloch .................................................................... 40

    B.    Plaintiff Christina Scorio ......................................................................... 42

    C.    Plaintiff Dawn Harris ............................................................................... 44

    D.    Plaintiff Bobbie Jo Geelen ...................................................................... 47

    E.    Plaintiff Phyllis Garrison ........................................................................ 50

    F.    Plaintiff Roland Plude .............................................................................. 52

    G.    Plaintiff Josko Smolcic ............................................................................ 54

    H.    Plaintiff Jacqulyn McGlynn ..................................................................... 57

VI.   CLASS ACTION ALLEGATIONS ................................................................. 59

VII.  CLAIMS FOR RELIEF .................................................................................... 64

    A.    NATIONWIDE CLAIMS ........................................................................ 64

    B.    CALIFORIA CLAIMS ............................................................................. 79

    C.    MICHIGAN CLAIMS .............................................................................. 85

    D.    NEBRASKA CLAIMS ............................................................................. 88

    E.    NEW JERSEY CLAIMS .......................................................................... 93

    F.    PENNSYLVANIA CLAIMS .................................................................... 97

    G.    TEXAS CLAIMS ................................................................................... 101

VIII. PRAYER FOR RELIEF ................................................................................. 106

IX.   DEMAND FOR JURY TRIAL ...................................................................... 107

Plaintiffs Michael McCulloch, Christina Scorio, Dawn Harris, Bobbie Jo Geelen, Phyllis Garrison, Ronald Plude, Josko Smolcic, and Jacqulyn McGlynn, on behalf of themselves and all others similarly situated (together, "Plaintiffs"), bring this action against Defendants Farmers Insurance Exchange, Farmers Group Inc., Farmers New World Life Insurance Company, Truck Insurance Exchange, and Fire Insurance Exchange (together, "Defendants"), and seek monetary damages, restitution, and declaratory and injunctive relief for the proposed Class, as defined below. Plaintiffs make the following allegations upon information and belief, the investigation of counsel, personal knowledge, and/or facts that are a matter of public record.

## I.    INTRODUCTION

1.    To lose control over personal information by no fault of your own can be devastating. It is not only an intrusion of privacy and a loss of control, but also a harbinger of future harm: for victims of a data breach, the risk of account takeovers, scam attempts, or attempted account takeovers rises 88%.[1] A data breach can have grave consequences for victims for years after the actual date of the breach. With the obtained information, thieves can wreak many forms of havoc: open new financial accounts, take out loans, obtain medical services, collect government benefits, or secure driver's licenses in the victims' names. Data breaches force victims to maintain constant vigilance over the misuse of their information.

2.    On May 29, 2025, cybercriminals infiltrated one of Defendants' databases (the "Data Breach").[2] The affected database contained the private information of Defendants' customers. This included names, addresses, dates of birth, driver's license

---

[1] Identity Theft Resource Center, *Annual Data Breach Report: Record Number of Data Compromises in 2025; 79 Percent Jump Over Five Years* (Jan. 29, 2026), https://www.idtheftcenter.org/post/2025-annual-data-breach-report-record-number-compromises/.

[2] Lawrence Abrams, *Farmers Insurance data breach impacts 1.1M people after Salesforce attack*, BleepingComputer (Aug. 25, 2025), https://www.bleepingcomputer.com/news/security/farmers-insurance-data-breach-impacts-11m-people-after-salesforce-attack/.

---

numbers, and/or truncated Social Security numbers ("Private Information").

3.      By hacking into the database, cybercriminals accessed and were able to steal the Private Information of more than one million customers of Defendants.

4.      The Data Breach was discovered by Defendants on May 30, 2025.

5.      On August 22, 2025, Defendants acknowledged that the Data Breach occurred.[3]

6.      By waiting nearly three months to notify their affected customers, Defendants deprived Plaintiffs and Class Members of the opportunity to take immediate measures to protect themselves against potential harm.[4]

7.      The exposed Private Information has significant value on illicit markets, particularly on the Dark Web, since Private Information can be used to commit identity theft, open fraudulent accounts, fraudulently file taxes, apply for and secure loans, obtain government benefits, or facilitate medical and financial fraud.[5] As a direct and foreseeable result of Defendants' conduct, Plaintiffs and Class Members face a heightened and continuing risk of identity theft and fraud, have suffered loss of privacy, have spent and will continue to spend time and money on mitigation efforts, and have

---

[3] Two nearly identical notice letters were sent by Farmers brand insurers, naming different insuring entities. These nearly-identical notice letters are: Farmers, *Notice of Security Incident*, *available at* https://oag.ca.gov/system/files/FNWL%20Sample%20Notification%20Letter_All%20States.pdf (naming Farmers New World Life Insurance Company); ClassAction.org, *Farmers Insurance Exchange Data Breach Notice 2025*, *available at* https://www.classaction.org/media/farmers-insurance-exchange-data-breach-notice-2025.pdf (naming "Farmers Insurance Exchange, Farmers Group, Inc. (its attorney-in fact), and their subsidiaries and affiliates").

[4] Anita George, *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs*, DigitalTrends (Oct. 16, 2019), *available at* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[5] U.S. Government Accountability Office, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 4, 2007), *available at* https://www.gao.gov/products/gao-07-737.

---

experienced diminution in the value of their Private Information. Plaintiffs seek damages, restitution, and injunctive relief to remedy Defendants' unlawful conduct and prevent future harm.

## II.    PARTIES

### A.    Plaintiffs

8.    Plaintiff Michael McCulloch is a natural person and a citizen of Michigan. He resides in Michigan, where he intends to remain.

9.    Plaintiff Christina Scorio is a natural person and a citizen of New Jersey. She resides in New Jersey, where she intends to remain.

10.    Plaintiff Dawn Harris is a natural person and a citizen of California. She resides in California, where she intends to remain.

11.    Plaintiff Bobbie Jo Geelen is a natural person and a citizen of Pennsylvania. She resides in Pennsylvania, where she intends to remain.

12.    Plaintiff Phyllis Garrison is a natural person and a citizen of Nebraska. She resides in Nebraska, where she intends to remain.

13.    Plaintiff Roland Plude is a natural person and a citizen of Texas. He resides in Texas, where he intends to remain.

14.    Plaintiff Josko Smolcic is a natural person and a citizen of Texas. He resides in Texas, where he intends to remain.

15.    Plaintiff Jacqulyn McGlynn is a natural person and a citizen of Texas. She resides in Texas, where she intends to remain.

### B.    Defendants

16.    Defendants Farmers Insurance Exchange, Truck Insurance Exchange, and Fire Insurance Exchange are reciprocal insurance exchanges through which Defendants issue policies and conduct business. Their principal place of business is in Woodland Hills, California, and they transact business in this District and throughout the United States.

17.    Defendant Farmers Group, Inc. is a Delaware corporation with its principal

place of business in Woodland Hills, California. It transacts business in this District and throughout the United States.

18.    Defendant Farmers New World Life Insurance Company is a Washington corporation with its principal place of business in Bellevue, Washington. It transacts business in this District and throughout the United States.

19.    Defendants engage in the business of providing property and casualty insurance products and related services to millions of consumers throughout the United States.

20.    Defendants hold themselves out as operating as a single entity under the names "Farmers" and "Farmers Insurance Group of Companies," which is comprised of "[a] number of insurers us[ing] and support[ing] the Farmers brand, both in the individual and employee/affinity group markets."[6] Defendants' privacy policies and commitments to their customers are made on substantively identical privacy notices in connection with their provision of insurance services throughout the Unted States.

21.    Throughout the class period and at all relevant times, each Defendant acted both individually and in concert with every other named Defendant in engaging in the conduct alleged herein. At all relevant times, each Defendant acted: (a) under express or implied agency; (b) as a principal; and/or (c) with actual or ostensible authority to engage on behalf of each Defendant in the conduct alleged in this Complaint. Defendants have joined together in a conspiracy, common enterprise, and common course of conduct, the purpose of which is and was to engage in the conduct alleged in this Complaint.

22.    Defendants acknowledge this, repeatedly holding themselves out as a single, unified operation. For example, on their website, they state that "*our companies make up one of the country's largest insurers of vehicles, homes and small businesses and provide a wide range of other insurance and financial services products.*"[7]

23.    Defendants describe themselves alternatively as "Farmers" or "Farmers

---

[6] Farmers, *About Us,* https://www.farmers.com/about-us/.

[7] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT                                                                 4

Insurance Group of Companies"[8] Defendants characterize themselves to their customers and the public as single, joint operation, with their slogan: "We Are Farmers."[9]

24.    The five Defendants' privacy policies are made jointly, with three Defendants issuing one policy and the other two issuing a nearly identical policy.[10]

25.    The notice letters sent to victims of the Data Breach also attributed the breach to Defendants jointly. The letters advised victims that "Farmers" was alerted to "suspicious activity involving an unauthorized actor accessing one of the vendor's databases containing Farmers customer information . . . ." The letters defined "Farmers" as: "Farmers Insurance Exchange, Farmers Group, Inc. (its attorney-in fact) and their subsidiaries and affiliates ('Farmers,' 'we,' or 'our')."

26.    Executives, employees, and management, and ownership substantially overlaps among the Defendants, sharing a "network of Farmers Insurance exclusive agencies, [and] tens of thousands of independent agents."[11]

27.    For example, Defendants Farmers Insurance Exchange, Fire Insurance Exchange, and Truck Insurance Exchange are inter-insurance exchanges that offer insurance through their subsidiaries, with Farmers Group, Inc. serving as their attorneys-

---

[8] Farmers, *Our Companies: Who we are*, https://www.farmers.com/companies/.

[9] *See, e.g.*, Farmers Insurance, *Farmers Insurance Commercials*, https://www.youtube.com/playlist?list=PLdMGa4pNY_X8yMA4acq7WlFskDr3dWn_n.

[10] Farmers, *Privacy Policy,* https://www.farmers.com/content/farmers/marketing/digital/aem/pdfs/privacy-center/Farmers-Privacy-Notice.pdf (Privacy Policy of Defendants Farmers Insurance Exchange, Truck Insurance Exchange, and Fire Insurance Exchange); Farmers, *Farmers New World Life Insurance Company Privacy Policy*; https://www.farmers.com/content/farmers/marketing/digital/aem/pdfs/privacy-center/09-FNWL-GLBA-Notice-Final-(Farmers-New-World-Life-Privacy-Notice).pdf (Privacy Policy of Defendants Farmers Group, Inc. and Farmers New World Life). Both privacy notices are available at: Farmers, *Privacy Center*, https://www.farmers.com/privacy-center/.

[11] Farmers, *About Us,* https://www.farmers.com/about-us/.

---

CONSOLIDATED CLASS ACTION COMPLAINT                                            5

in-fact and agent.[12]

28.    As their attorneys-in-fact, Farmers Group, Inc. also has the authority to make decisions related to, and manage, data security on behalf of, and as agent for, other named Defendants.

29.    The Defendants' alleged common enterprise and common course of conduct here continues to the present. Each Defendant was aware, or should have known, that the other Defendants were engaging in or planned to engage in the violations of law alleged in this Complaint. Each Defendant aided and abetted the other Defendants in committing the wrongful acts alleged by (1) assisting in the commission of those alleged wrongful acts, and (2) intending to, and, in fact, assisting in, facilitating, or encouraging the commission of the wrongful acts.

## III.    JURISDICTION AND VENUE

30.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of Class Members is more than 100 and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendants' citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

31.    The Court has general jurisdiction over Defendants Farmers Insurance Exchange, Farmers Group, Inc., Truck Insurance Exchange, and Fire Insurance Exchange because each has its principal place of business in this District and is organized under the laws of the State of California.

32.    This Court has specific jurisdiction over all Defendants because all Defendants have sufficient minimum contacts with California to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. All Defendants are licensed to sell life insurance products in California and do so on a continuous and systematic basis, and the claims alleged herein

---

[12] Farmers, *Our Companies: Who we are*, https://www.farmers.com/companies/.

arise out of each Defendants' sale of insurance policies in California. Plaintiffs' claims arise substantially from events, acts, or omissions that took place in California.

33. Moreover, the California long-arm statute enables jurisdiction over this matter under the California Code of Civil Procedure § 410.10, which states that a court may assert jurisdiction over a nonresident defendant where the defendant has sufficient "minimum contacts" with the forum such that maintenance of the action does not offend traditional notions of fair play and substantial justice. All Defendants' intentional provision of insurance services to individuals in California provides sufficient "minimum contacts" with the forum state to permit jurisdiction.

34. Venue is proper in the Central District of California under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this District.

## IV.   FACTUAL ALLEGATIONS

### A.   Defendants Collect, Store, Use, and Share Plaintiffs' and Class Members' Private Information.

35. Defendants make up one of the country's largest insurers of vehicles, homes and small businesses. Defendants serve millions of households and businesses across the entire United States, offering car, property, life, commercial and other types of insurance services and products.[13]

36. The three primary insurers within the Farmers organization, Farmers Insurance Exchange, Fire Insurance Exchange, and Truck Insurance Exchange operate as inter-insurance exchanges owned by their policyholders. Each are part of the broader Farmers "reciprocal exchange" structure, with each using a shared infrastructure and managed centrally by Farmers Group, Inc., which provides administrative and

---

[13] Farmers Newsroom, *Farmers Insurance Exchange Ranks Among the Nation's Largest Companies as National Insurer Makes Fortune 500 List Leading Multiline Insurer Enters List at No. 264* (June 4, 2015), *available at* https://newsroom.farmers.com/2015-06-04-Farmers-Insurance-Exchange-Ranks-Among-the-Nations-Largest-Companies-as-National-Insurer-Makes-Fortune-500-List.

---

CONSOLIDATED CLASS ACTION COMPLAINT

7

operational services along with its subsidiary, Farmers New World Life Insurance Company.[14]

37.    Salesforce is a cloud-based software-as-a-service ("SaaS") company that offers a suite of integrated products and services that helps companies manage customer interactions, streamline sales, and deliver personalized marketing and commerce experiences.[15] As part of Defendants' business operations, Defendants each use Salesforce's cloud-based customer relationship management ("CRM") platform to store their customers' Private Information, including the Private Information of Plaintiffs and Class Members.

38.    Defendants routinely collect, share, use, centralize, and maintain sensitive and confidential Private Information about their customers and potential customers in the process of providing a wide range of insurance services and products, which includes collecting information on customers' driver's license numbers and Social Security numbers.

39.    The Private Information collected by Defendants likewise includes or can include information such as names, email addresses, phone numbers, mailing addresses, and financial information, tax information, credit history, employment information, and insurance information. Defendants require customers to provide this information in connection with using their services.

40.    By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiffs and Class Members, Defendants assumed legal and equitable duties to those individuals to protect and safeguard that Private Information from unauthorized access and intrusion and to promptly notify customers if a breach occurs.

---

[14] Farmers, *Our Companies: Who we are*, https://www.farmers.com/companies/.

[15] Salesforce, *What is Salesforce?*, https://www.salesforce.com/products/what-is-salesforce/.

**B.      Defendants Promise to Protect Plaintiffs' and Class Members' Private Information.**

41.      Defendants had a duty to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized disclosures. Plaintiffs and Class Members provided their Personal Information to Defendants with the understanding that Defendants would comply with their Privacy Notices and obligations to keep such information confidential and secure from unauthorized disclosures.

42.      When consumers provide confidential information to Defendants, they do so with the reasonable belief that Defendants will take sufficient measures to safeguard their Private Information from foreseeable threats, including cyberattacks.

43.      Defendants are and were aware of the sensitive nature of the Private Information they collect, and they acknowledge the importance of data privacy. In the Privacy Notices on the Defendants' website, Defendants represent that: "our customers are our most valued assets. Protecting your privacy is important to us."[16]

44.      The Privacy Notices also identify the policies and procedures Defendants purportedly employ to protect sensitive Private Information:

> We restrict access to personal information to those individuals, such as our employees and agents, who provide you with our products and services. We require individuals with access to your information to protect it and keep it confidential. We maintain physical, electronic, and procedural safeguards that comply with applicable regulatory standards to guard your nonpublic Private Information. We do not disclose any nonpublic Private Information about you except as described in this notice or as otherwise required or permitted by applicable law.[17]

45.      The Privacy Notices make clear that Defendants were aware of the need to safeguard the sensitive Private Information entrusted to it by consumers as part of providing insurance and other financial services.

---

[16] Farmers, *Privacy Center*, https://www.farmers.com/privacy-center/.

[17] *Id.*

## C.    The Data Breach.

46.    On May 30, 2025, Defendants discovered suspicious activity involving an unauthorized actor accessing one of their third-party hosted databases.[18] Following an investigation, Defendants learned that threat actors accessed their Salesforce database on May 29, 2025, and exfiltrated Plaintiffs' and Class Members' names, addresses, dates of birth, driver's license numbers, and/or partial Social Security numbers.[19]

47.    The attackers were able to use basic social engineering attacks to impersonate Salesforce employees and convince Defendants' employees and/or agents to link a malicious "OAuth" login authenticator app with Defendants' Salesforce platforms. Once that was accomplished, the threat actors were able to connect to Defendants' database on which Plaintiffs' and Class Members' unencrypted Private Information was stored and download and exfiltrate that information.

48.    The attackers gained access to the Private Information of over one million individuals as a result of the breach.

49.    Given that the threat actors successfully implemented malware and exfiltrated the Private Information of over one million individuals to third-party networks, Defendants therefore did not have systems in place to detect or prevent the Data Breach.

50.    The threat actors claiming responsibility for the breach include well-known cybercriminals ShinyHunters and Scattered Spider.

51.    Scattered Spider is a notorious cybercriminal enterprise. The Federal Bureau of Investigation (FBI) and the Cybersecurity and Infrastructure Security Agency

---

[18] Farmers, *Notice of Security Incident*, *available at* https://oag.ca.gov/system/files/FNWL%20Sample%20Notification%20Letter_All%20States.pdf (naming Farmers New World Life Insurance Company); ClassAction.org, *Farmers Insurance Exchange Data Breach Notice 2025*, *available at* https://www.classaction.org/media/farmers-insurance-exchange-data-breach-notice-2025.pdf (naming "Farmers Insurance Exchange, Farmers Group, Inc. (its attorney-in fact), and their subsidiaries and affiliates").

[19] *Id.*

---

CONSOLIDATED CLASS ACTION COMPLAINT                                              10

(CISA) released a joint report warning the public about Scattered Spider. This Cybersecurity Advisory states that "Scattered Spider is a cybercriminal group that targets large companies and their contracted information technology (IT) help desks. Scattered Spider threat actors, per trusted third parties, have typically engaged in data theft for extortion and have also been known to utilize BlackCat/ALPHV ransomware alongside their usual [tactics, techniques, and procedures]."[20]

52.    ShinyHunters is a well-known collective of cybercriminals that has been credited with several large-scale data breaches going back to 2020. ShinyHunters initially began by exfiltrating and attempting to sell stolen data but has since transitioned to using stolen data for extortion attempts and then, sometimes several years after the fact, publishing the data to anyone with internet access.[21]

53.    A representative of ShinyHunters told reporters, "[l]ike we have said repeatedly already, ShinyHunters and Scattered Spider are one and the same, they provide us with initial access and we conduct the dump and exfiltration of the Salesforce CRM instances. Just like we did with Snowflake."[22]

54.    These groups target Private Information for its value in committing fraud and identity theft. A ransomware attack is a type of cyberattack that is frequently used to target companies for the Private Information that they maintain.[23] Companies should

[20] Cybersecurity and Infrastructure Sec. Agency, *Scattered Spider* (Nov. 16, 2023), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-320a.

[21] *The Evolution of Shiny Hunters: From Data Leaks to Extortions* (August 26, 2021), https://reliaquest.com/blog/the-eeveelution-of-shinyhunters-from-data-leaks-to-extortions/ (last visited June 26, 2025).

[22] Lawrence Abrams, *Hackers leak Allianz Life data stolen in Salesforce attacks*, BleepingComputer (Aug. 12, 2025), *available at* https://www.bleepingcomputer.com/news/security/hackers-leak-allianz-life-data-stolen-in-salesforce-attacks/. The reference to "Snowflake" concerns a massive 2024 data breach at Snowflake, which is a cloud-based data warehousing and processing company.

[23] Danny Palmer, *Ransomware warning: Now attacks are stealing data as well as encrypting it*, ZDNET (July 14, 2020), *available at*

treat ransomware attacks as any other data breach incident because ransomware attacks do far more than simply hold networks hostage — "ransomware groups sell stolen data in cybercriminal forums and Dark Web marketplaces for additional revenue."[24]

55.    Once the data is exfiltrated from a network, its confidential nature is destroyed and it should be "assume[d] it will be traded to other threat actors, sold, or held for a second/future extortion attempt."[25] And even where companies pay for the return of data attackers often leak or sell the data regardless because there is no way to verify copies of the data are destroyed.[26]

56.    Data breaches are preventable.[27] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[28] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[29]

57.    Most reported data breaches "are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. Appropriate information security controls, including encryption, must be implemented and enforced

---

https://www.zdnet.com/article/ransomware-warning-now-attacks-are-stealing-data-as-well-as-encrypting-it/.

[24] Center for Internet Security, *Ransomware: The Data Exfiltration and Double Extortion Trends*, *available at* https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends.

[25] *Id.*

[26] *Id.*

[27] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012 ed.), *available at* https://lawcat.berkeley.edu/record/394088.

[28] *Id.* at 17.

[29] *Id.* at 28.

---

in a rigorous and disciplined manner so that a *data breach never occurs*."[30]

58.    Defendants could have prevented or mitigated the consequences of the Data Breach by, among other things, implementing employee and vendor training to detect social engineering attacks, requiring that employees and vendors verify the identity of third parties by requiring they call back to the verified third-party office line or requesting preset verification codes, implementing strict multi-factor authentication for employees and vendors, limiting access to sensitive data and requiring step-up authentication for access to sensitive data, monitoring their network for logins from unrecognized locations or devices and the transfer of large volumes of data the third-party networks, implementing software to detect and block phishing links, and encrypting data at rest and in transit and deleting data that they were no longer required to maintain. These are all basic and expected industry standard data security measures.

59.    Had these training and security steps been taken, the prepared employees and vendors would not have disclosed access credentials through the false "OAuth" login authenticator app. And even if cybercriminals had obtained the login information, they would not have had access to the next phase of necessary codes sent through multi-factor authentication. Finally, even if the cybercriminals had managed to access the sensitive data, it would have been worthless to them and unable to be exploited and abused had the sensitive data been encrypted. Because these steps were not sufficiently taken by Defendants, Plaintiffs and Class Members are now forever unable to control their Private Information.

60.    As a consequence of the Data Breach and Defendants' failure to implement sufficient data security safeguards, Plaintiffs and Class Members face an imminent and substantial risk of fraud, identity theft, and other harms caused by the unauthorized disclosures of their Private Information—a risk that will persist for the rest of their lives. Plaintiffs and Class Members must devote time, money, and energy to protect themselves, to the extent possible, from these harms.

---

[30] *Id.*

**D.**     **The Data Breach Was a Foreseeable Result of Defendants' Data Security Failures.**

61.     Defendants were well aware that the Private Information they collect, store, use, and derive benefits from is highly sensitive and of significant value to those who seek to use it for nefarious purposes.

62.     Defendants also knew that a breach of the third-party database containing Plaintiffs' Private Information entrusted to Defendants and its resulting exposure would result in the increased risk of identity theft and fraud against the individuals whose Private Information was stolen.

63.     These risks are not theoretical; in recent years, numerous high-profile breaches have occurred in the insurance sector, including Aflac, Liberty Mutual, Landmark Admin, and Travelers. These breaches put Defendants on notice that their electronic records would be targeted by cybercriminals.

64.     In addition, in recent years, numerous high-profile data breaches have occurred as a result of third-party tools, including Progress Software Corporation (MOVEit file transfer software), Fortra (GoAnyWhere file transfer software), CLEO (file transfer software), and Snowflake (cloud storage accounts). These breaches put Defendants on notice that electronic records stored on third-party systems would be targeted by cybercriminals.

65.     In 2025, the Identity Theft Resource Center reported a record 3,322 data compromises, a 5% increase from 2024. These incidents exposed approximately 278.8 million victim notices and represent a 79% increase over five years. The financial services sector remained the most frequently targeted industry, followed by healthcare and professional services. Across industries, breaches increasingly involved the theft of sensitive personal and financial data, driven largely by phishing, credential theft, and social engineering attacks.[31]

---

[31] Identity Theft Resource Center, *2025 Annual Data Breach Report: Record Number of Data Compromises* (Jan. 29, 2026), *available at*

66.    In 2024, security researchers noted that, "when including the extortion-only, no-encryption data theft attacks, which are often conducted by ransomware actors, the number [of ransomware attacks] is up year-over-year. Ransomware and data extortion attacks were present in 32% of reported attacks, and 92% of industries experienced ransomware as a top threat targeting them."[32]

67.    Consequently, Defendants should have known of the importance of safeguarding Plaintiffs and Class Members' Private Information and of the foreseeable consequences that would occur if their data security system was breached, including the significant costs that would be imposed on victims as a result of a breach.

**E.    Defendants Knew They Were at High Risk for a Data Breach.**

68.    Beyond these statistics regarding the increasingly high incident rate of data breaches, Defendants knew that they were at high risk for being targeted by cybercriminals.

69.    On March 12, 2025, two and a half months before the Breach, Salesforce publicly warned its customers that "threat actors have been observed employing various social engineering tactics, including voice phishing (i.e., "vishing"), to impersonate members of an IT Support team over the phone. They have been reported luring our customers' employees and third-party support workers to phishing pages designed to steal credentials and MFA tokens or prompting users to navigate to the login.salesforce[.]com/setup/connect page in order to add a malicious connected app. In some cases, we have observed that the malicious connected app is a modified version of the Data Loader app published under a different name and/or branding. Once the threat actor gains access to a customer's Salesforce account or adds a connected app, they use

---

https://www.idtheftcenter.org/post/2025-annual-data-breach-report-record-number-compromises/.

[32] Alexander Culafi, *Verizon DBIR: Vulnerability exploitation in breaches up 180%*, TechTarget (May 1, 2024), *available at* https://www.techtarget.com/searchsecurity/news/366582952/Verizon-DBIR-Vulnerability-exploitation-in-breaches-up-180.

---

CONSOLIDATED CLASS ACTION COMPLAINT                    15

the connected app to exfiltrate data."[33]

70.    Salesforce also explained how to prevent such a breach, recommending that their customers strengthen their cybersecurity posture and defend against these types of sophisticated threats, such as "1. Set login ranges and trusted Ips . . . . 2. Follow the Principle of Least Privilege . . . . 3. Enable Multi-Factor Authentication (MFA) . . . . 4. Explore Salesforce Shield's comprehensive security tools . . . . 5. Add a Security Contact to your organization."[34]

71.    Defendants have yet to provide information about the CRM system connected to the Data Breach or the threat actor.

72.    ShinyHunters has a history of conducting similar high-profile data breaches using the same type of tactics—including those against PowerSchool and Snowflake, which impacted companies like Santander, Ticketmaster, AT&T, Advance Auto Parts, Neiman Marcus, and Cylance.[35]

73.    Given the warning by Salesforce, Defendants were well aware of the possibility that sophisticated hacking groups may attempt to use social engineering to access their customer relationship management platforms.[36]

74.    Defendants knew they were permitting their employees to use a CRM and their internal network service to store and transmit valuable and highly sensitive Private

---

[33] Salesforce, *Protect Against Social Engineering*, *available at* https://www.salesforce.com/blog/protect-against-social-engineering/.

[34] *Id.*

[35] Lawrence Abrams, *ShinyHunters Behind Salesforce Attacks at Qantas Allianz Life and ILMH*, BleepingComputer (July 30, 2025), *available at* https://www.bleepingcomputer.com/news/security/shinyhunters-behind-salesforce-data-theft-attacks-at-qantas-allianz-life-and-lvmh/.

[36] Further, numerous past data breaches put Defendants on notice that their security and privacy protections were inadequate. UpGuard, *Salesforce Extortion Accelerates With New Leak Site*, https://www.upguard.com/blog/salesforce-leak-extortion-scattered-lapsus-hunters; Twingate, *Salesforce Data Breach: What & How It Happened?* (Jun. 14, 2024), https://www.twingate.com/blog/tips/Salesforce-data-breach.

---

CONSOLIDATED CLASS ACTION COMPLAINT                                    16

Information. As a result, Defendants knew their systems would be attractive targets for cybercriminals. Indeed, they had been specifically warned that a sophisticated hacking group was specifically targeting such CRM systems and, indeed, seeking to extort companies using Salesforce—the vendor Defendants also used.

75. Defendants also knew that a breach of their systems, and exposure of the information therein, would result in the increased risk of identity theft and fraud against the individuals whose Private Information was compromised.

76. Defendants knew or should have known that immediate action was necessary to mitigate the access and disclosure of the Private Information entrusted to them. However, Defendants failed to do so and caused Plaintiffs' and Class Members' highly sensitive Private Information to be exposed to the public.

**F.    Defendants Failed to Implement Sufficient Security Measures to Prevent a Data Breach.**

77. Salesforce provided measures to specifically protect against the misuse of Salesforce CRM that Defendants did not follow. Specifically, Salesforce warned its users to: (1) adhere to the principle of least privilege, especially for data access tools; (2) enforce IP-based access restrictions; (4) leverage advanced security monitoring and policy enforcement with Salesforce Shield; and (5) enforce multi-factor authentication universally. Defendants failed to implement these, and other, basic data security protocols.

78. For example, Defendants failed to utilize the well-known "Principle of Least Privilege," which limits users access to and permissions in sensitive systems. Salesforce allows its customers to configure access to its CRM instances to restrict the number of users who can access the systems and perform mass data operations. Defendants failed to utilize those tools, allowing employees to grant access to complete strangers (the hackers) to enter their CRM even though it held highly sensitive and private information. Further, because Defendants did not limit the users who could conduct "mass data operations," once inside the CRM, the hackers were able to transfer

large volumes of data out of the system and, thereby, gain access to Plaintiffs' and Class Members' Private Information.

79.    Additionally, Salesforce Shield specifically allows customers to monitor for activities like large data downloads, and automatically issues alerts upon large data download attempts or blocks such activity. As experts have opined, such real-time monitoring is essential to cybersecurity. "Cybersecurity or process monitoring is continuously observing and analyzing your computer network or systems to prevent cyberattacks. The primary objective of monitoring in cybersecurity is to quickly identify signs of vulnerability and responding to potential security threats in real-time."[37] Here, not only did Defendants lack their own monitoring tools sufficient to identify and stop the breach, but they also failed to use tools Salesforce made available to them to specifically monitor and access Defendants' CRM instance, which contained a wealth of private data.

80.    Defendants should have noticed the Data Breach through proper endpoint and network monitoring and scanning.

81.    The attackers exfiltrated a massive amount of Private Information. Such actions should have only been possible by Defendants' network administrators and should have required even those administrators to pass through additional security features. Such exfiltration activity should have been detected and prevented and should have raised numerous red flags to Defendants had they properly monitored their systems.

82.    Had Defendants implemented adequate cybersecurity monitoring, the exfiltration of Plaintiffs' and Class Members' Private Information would have been prevented or would have been much smaller in scope.

83.    Defendants should have employed IP whitelisting, "[o]ne of the simplest yet effective methods of safeguarding systems . . . . It is particularly beneficial for

---

[37] SentinelOne, *Cyber Security Monitoring: Definition and Best Practices* (Sept. 7, 2025), *available at* https://www.sentinelone.com/cybersecurity-101/cybersecurity/cyber-security-monitoring/.

businesses that rely on remote access or have distributed teams but want to maintain strict security protocols . . . . IP whitelisting is a security practice that involves creating a list of trusted IP addresses granted access to a specific server, application, or network. By using IP whitelisting, only pre-approved IP addresses can interact with your system. By restricting access to a select group of devices based on their IP addresses, you can limit exposure to potential attacks and unauthorized access. The method effectively controls access to critical business systems, cloud infrastructure, and online services."[38]

84.     The United States Department of Commerce also produced guidance for application whitelisting via the National Institute of Standards and Technology ("NIST") Special Publication 800-167: *Guide to Application Whitelisting*, which provides specific guidance to companies on how to implement whitelisting, to prevent "installation and/or execution of any application that is not specifically authorized for use on a particular host. This mitigates multiple categories of threats, including malware and other unauthorized software."[39]

85.     Defendants were notified of the Data Breach on May 30, 2025, one day after the Breach occurred. Defendants, however, did not announce the Data Breach until August 22, 2026, allowing for an *84-day* period in which cybercriminals were able to use, warehouse and expose Plaintiffs' and Class Members' Private Information to the public, unbeknownst to Plaintiffs and Class Members.

86.     This means that, from May 29 to August 22, 2025, Plaintiffs and Class Members had no ability to guard against the misuse of their stolen Private Information and were robbed of the opportunity to freeze their credit cards, set up credit monitoring, or change their credentials. Because of Defendants' failure to communicate with the affected individuals, Plaintiffs' and Class Members' injuries stemming from the Data

---

[38] Timothy Shim, *IP Whitelisting: The Beginner's Guide*, RapidSeedbox.com (June 20, 2025), *available at* https://www.rapidseedbox.com/blog/ip-whitelisting.

[39] Adam Sedgewick, et al., *Guide to Application Whitelisting*, NIST SPECIAL PUBLICATION 800-167, at 2 (Oct. 2015), *available at* https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-167.pdf.

CONSOLIDATED CLASS ACTION COMPLAINT                                              19

Breach increased substantially in severity.

### G.    The Private Information Is or Will Be Published on the Dark Web.

87.    It is almost a certainty that Plaintiffs' and Class Members' Private Information has or will be released on, or will be listed for sale on, the "Dark Web."

88.    The Dark Web is a part of the World Wide Web that is not accessible through traditional internet browsers. The term "Dark Web" is used to distinguish from the "clear web," the part of the World Wide Web that is readily accessible through traditional internet browsers. The Dark Web is accessed through The Onion Router ("Tor"), a privacy-focused communication system designed to enable anonymous internet browsing. It achieves this by routing web traffic through multiple volunteer-operated servers ("relay(s)"), encrypting data at each step to ensure that both the user's location and browsing activity are difficult to trace. Tor uses a technique called "onion routing," where data is encrypted in layers like an onion. Each relay in the network peels away a layer of encryption before passing the data to the next relay. This ensures that no single relay knows both the origin and destination of the data.

89.    The Dark Web poses significant challenges to cyber security professionals and law enforcement agencies. The Dark Web is legal to access and operate, and it has some legitimate applications and sites. But its hidden nature and employment of multi-level encryption make detecting and monitoring illegal activity difficult. Unlike the clear web, Dark Web sites do not advertise their existence. The anonymity of the Dark Web led to the creation of a number of markets and forums which traffic in illegal merchandise and content, including stolen Private Information.[40]

90.    Once stolen private information is posted on the Dark Web, it will most

---

[40] *Crime and the Deep Web*, Stevenson University, *available at* https://www.stevenson.edu/online/about-us/news/crime-deep-web/; *Defending Against Malicious Cyber Activity Originating from Tor*, CISA (Aug. 2, 2021), *available at* https://www.cisa.gov/news-events/cybersecurity-advisories/aa20-183a.

---

CONSOLIDATED CLASS ACTION COMPLAINT                                          20

likely be distributed to multiple different groups and individuals,[41] each of which can use that information for fraud and identity theft.

91.    This data lifecycle is confirmed with experiments. In 2015, researchers at BitGlass created a list of 1,568 phony names, Social Security numbers, credit card numbers, addresses and phone numbers, rolled them in an Excel spreadsheet, and then "watermarked" it with their code that silently tracked any access to the file. The data was quickly spread across five continents: North America, Asia, Europe, Africa and South America. In the end, 47 different parties downloaded the data. It was mainly downloaded by users in Nigeria, Russia and Brazil, with the most activity coming from Nigeria and Russia.[42] This experiment demonstrated that data released on the Dark Web will quickly spread around the world. Since cybercriminals typically conduct data breaches to sell the victims' breached sensitive information on the Dark Web, this will likely be the fate of Plaintiffs' and Class Members' sensitive Private Information.[43]

**H.    The Data Breach Significantly Harms Victims.**

92.    Private Information is valuable property. Its value is axiomatic, considering the market value and profitability of "Big Data" to corporations in America. Illustratively, Alphabet Inc., the parent company of Google, reported in its 2020 Annual

[41] *The Dark Web and Cybercrime*, U.S. Dep't of Health and Human Servs. Cybersecurity Program, Office of Information Security, at 10 (July 23, 2020), *available at* https://www.hhs.gov/sites/default/files/dark-web-and-cybercrime.pdf.

[42] Kelly Jackson Higgins, *What Happens When Private Information Hits the Dark Web*, Dark Reading (Apr. 7, 2015), *available at* https://www.darkreading.com/cyberattacks-data-breaches/what-happens-when-personal-information-hits-the-dark-web; *see also* Kristin Finklea, *Dark Web*, Congressional Research Service, at 10 (July 7, 2015), *available at* https://nsarchive.gwu.edu/sites/default/files/documents/2696100/Document-8.pdf; Pierluigi Paganini, *How Far Do Stolen Data Get in the Deep Web After a Breach?*, Security Affairs (Apr. 12, 2015), *available at* https://securityaffairs.com/35902/cyber-crime/propagation-data-deep-web.html.

[43] F-Secure, *Why hackers want your personal information – and how to protect it* (Nov. 21, 2024), *available at* https://www.f-secure.com/en/articles/why-do-hackers-want-your-personal-information.

CONSOLIDATED CLASS ACTION COMPLAINT                                    21

Report a total annual revenue of $182.5 billion and net income of $40.2 billion.[44] $168.6 billion of this revenue derived from its Google business,[45] which is driven almost exclusively by leveraging the Private Information it collects about users of its various "free" products and services.

93. Criminal law also recognizes the value of Private Information and the serious nature of the theft of Private Information by imposing prison sentences. This strong deterrence is necessary because cybercriminals extract substantial revenue through the theft and sale of Private Information. Once a cybercriminal unlawfully acquires Private Information, the criminal can demand a ransom or blackmail payment for its destruction, use the Private Information to commit fraud or identity theft or sell the Private Information to other cybercriminals on the black market.

94. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2(a). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 16 C.F.R. § 603.2(b).

95. Identity thieves use Private Information for a variety of crimes. According to Experian, with access to an individual's private information, criminals can do more than just empty a victim's bank account. They can also commit all other manner of fraud, including using the victim's Private Information to obtain government benefits, file a fraudulent tax return to obtain a large refund, get medications or medical procedures, or to transfer home titles and then take mortgages against the victim's home. In addition,

---

[44] *Alphabet Inc. Annual Report (Form 10-K)*, SEC, at 29, 32 (Feb. 3, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001652044/000165204421000010/goog-20201231.htm.

[45] *Id.* at 33.

---

identity thieves may take over a victim's social media accounts and blackmail the person by threatening to share personal or embarrassing information or pictures with the victim's contacts.[46]

96.     Identity theft presents many challenges. In a survey, the Identity Theft Resource Center ("ITRC") found that 76% of victims of identity crimes who reached out to the ITRC for assistance needed more than a month to resolve issues stemming from identity theft, and 48% of those victims still had not resolved their issues after a year.[47]

97.     Theft of Social Security numbers, or even a portion thereof, creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new Social Security number, a breach victim has to demonstrate ongoing harm from misuse of their Social Security number, and a new Social Security number will not be provided until after the victim experiences the harm. Theft of Social Security numbers in combination with other Private Information (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity due to their sensitive nature.

98.     Driver's license information, which was compromised in the Data Breach, is incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information."[48]

99.     A driver's license can be a critical part of a fraudulent, synthetic identity –

[46] Louis DeNicola, *What Can Identity Thieves Do with Your Private Information and How Can You Protect Yourself*, Experian (Apr. 8, 2025), *available at* https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[47] *Consumer Impact – Business Impact Report*, ITRC, at 26 (Oct. 2024), *available at* https://www.idtheftcenter.org/publication/itrc-2024-consumer-and-business-impact-report/.

[48] Lee Mathews, *Hackers Stole Consumers' License Numbers From Geico In Months-Long Breach*, Forbes (Apr. 20, 2021), *available at* https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/.

CONSOLIDATED CLASS ACTION COMPLAINT                                                    23

which go for about $1200 on the Dark Web. On its own, a forged license can sell for around $200."[49]

100.    According to national credit bureau Experian:

A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you. Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.

101.    According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[50] However, this is not the case. As cybersecurity experts point out:

"It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks."[51]

102.    Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[52]

---

[49] *Id.*

[50] Scott Ikeda, *Geico Data Breach Leaks Driver's License Numbers, Advises Customers to Watch Out for Fraudulent Unemployment Claims*, CPO Magazine (Apr. 23, 2021), *available at* https://cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/.

[51] *Id.*

[52] Ron Lieber, *How Identity Thieves Took My Wife for a Ride,* NY TIMES (Apr. 27, 2021), *available at* https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html.

CONSOLIDATED CLASS ACTION COMPLAINT                                    24

103.   Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers, driver's license numbers and names.

104.   Beyond monetary losses and identity fraud, data breaches also have a deep, psychological impact on their victims:

> In some ways, a cyber attack can feel like the digital equivalent of getting robbed, with a corresponding wave of anxiety and dread. Anxiety, panic, fear, and frustration—even intense anger—are common emotional responses when experiencing a cyber attack. While expected, these emotions can paralyze you and prolong or worsen a cyber attack. [53]

### I.    Victims of Data Breaches Must Expend Time and Money to Mitigate Their Risk of Harm.

105.   Cybercriminals can and do use the precise Private Information that Defendant was entrusted to safeguard to perpetrate financial crimes that harm Plaintiffs and Class Members.

106.   The FTC recommends that identity theft victims take several steps to protect their Private Information after a data breach, including contacting one of the three credit bureaus to place a fraud alert (and to consider an extended fraud alert that lasts for seven years if identity theft occurs), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit and correcting their credit reports.[54]

107.   There may also be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and also between when Private

[53] Amber Steel, *The Psychological Impact of Cyber Attacks*, LastPass (Aug. 17, 2022), *available at* https://blog.lastpass.com/posts/the-psychological-impact-of-cyber-attacks.

[54] FTC, *Identity Theft Recovery Steps*, https://www.identitytheft.gov/Steps.

---

Information is stolen and when it is used. According to the GAO report: "[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[55]

108.   There may be a time lag between when sensitive Private Information is stolen, when it is used and when the victim discovers its use. On average, it takes approximately three months for a victim to discover their identity was stolen and used and it takes some victims up to three years to learn that information.[56]

109.   Furthermore, data breaches that expose any personal data, and in particular non-public data of any kind (e.g., names, addresses, and dates of birth), directly and materially increase the chance that a potential victim is targeted in the future by a spear phishing attack, which often result in a high rate of identity theft, fraud and extortion.[57]

---

[55] *Private Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, at 29 (June 2007), *available at* https://www.gao.gov/assets/270/262899.pdf.

[56] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS, Vol. 17, No. 5, at 12 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

[57] *See, e.g.,* Jessica Davis, *Blackbaud Confirms Hackers Stole Some SSNs, as Lawsuits Increase,* TechTarget and Informa Tech's Digital Businesses Combine (Sept. 30, 2020), https://www.techtarget.com/healthtechsecurity/news/366595050/Blackbaud-Confirms-Hackers-Stole-Some-SSNs-as-Lawsuits-Increase (concluding that Private Information "in the hands of fraudsters, [makes consumers] particularly susceptible to spear phishing—a fraudulent email to specific targets while purporting to be a trusted sender, with the aim of convincing victims to hand over information or money or infecting devices with malware"); *see also* Mich. Dep't of Attorney General, *Attorney General Nessel Reminds Consumers to Watch For Phishing Scams Following Blackbaud Security Breach* (Sept. 18, 2020), *available at* https://www.michigan.gov/ag/news/press-releases/2020/09/18/attorney-general-nessel-reminds-consumers-to-watch-for-phishing-scams (noting the accessed Private Information "generally included names, titles, telephone numbers, email addresses, mailing addresses, dates of birth and, more importantly, donor information such as

---

110.  One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[58] With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

111.   The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

112.   Thus, even if certain information was purportedly not involved in the Data

donation dates, donation amounts, giving capacity, philanthropic interests and other donor profile information.").

[58] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the Dark Web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), *available at* https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/.

CONSOLIDATED CLASS ACTION COMPLAINT                                              27

Breach, the unauthorized parties could use Plaintiffs' and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiffs and Class Members.

113.    Plaintiffs' and Class Members' stolen Private Information will continue to be leaked and traded on the Dark Web, meaning Plaintiffs and Class Members will remain at an increased risk of fraud and identity theft for many years into the future. Indeed, some Plaintiffs and Class Members are in the very early stages of their lives— in their twenties and thirties. Thus, as the respective Data Breach Notices advise, customers, including Plaintiffs and Class Members, must vigilantly monitor their financial accounts for many years to come.

**J.      The Data Breach Caused Plaintiffs and the Class Demonstrable Harm.**

114.    Defendants refused to provide adequate compensation for Plaintiffs' and Class Members' injuries.

115.    The Private Information exposed in the Data Breach has real value, as explained herein. Plaintiffs and Class Members are therefore deprived of their rights to control that property and have lost value they might otherwise incur from that Private Information.[59]

116.    Plaintiffs and Class Members already spent significant time monitoring their accounts, changing login credentials and recovering from the inevitable fraud and identity theft which will occur, and deserve to be compensated. Defendant has not made

---

[59] Ravi Sen, *Here's How Much Your Private Information Is Worth to Cybercriminals – and What They Do with It,* PBS NEWS (May 14, 2021) https://www.pbs.org/newshour/science/heres-how-much-your-personal-information-is-worth-to-cybercriminals-and-what-they-do-with-it.

[59] *Id.*

compensation or other remedies available for these very real injuries.[60]

117. Defendants offered no compensation for the aggravation, agitation, anxiety and emotional distress that Plaintiffs and Class Members suffered, and will continue to suffer, as a result of the Data Breach. The knowledge that their information is out in the open, available for sale and exploitation at any time in the future, is real harm that also deserves compensation.

118. Plaintiffs and Class Members were also deprived of the benefit of their bargain when they interacted with Defendants. Defendants had a duty to take reasonable steps to protect the Private Information of the individuals whose information was entrusted to them, and those individuals entrusted that information to Defendants in exchange for Defendants taking on that duty. This duty was inherent in the relationships between Plaintiffs and Class Members and Defendants, whether through express contractual terms, implied contractual terms, bailment or statutory or implied duties of good faith and fair dealing.

119. Defendants did not take sufficient steps or even attempt to make Plaintiffs and Class Members whole. Defendants failed in their duty to protect Plaintiffs' and Class Members' Private Information and failed in their duty to help these consumers protect themselves in the future.

**K.     Defendants Failed to Follow Industry Standards for Data Security.**

120. Defendants had obligations arising under the FTC Act, industry standards, common law, and their own promises and representations made to Plaintiffs and Class Members to keep their Private Information confidential and protected from unauthorized access and disclosure.

121. Despite Defendants' knowledge of the continued risks to Plaintiffs' and Class Members' Private Information, Defendants failed to use reasonable security

---

[60] Time spent monitoring accounts is another common and cognizable, compensated harm in data breach cases. *See, e.g.*, Equifax Data Breach Settlement, https://www.equifaxbreachsettlement.com/.

procedures and practices appropriate to the nature of the Private Information maintained on Plaintiffs and Class Members. As described below, had Defendants implemented industry-standard security measures and adequately invested in data security, unauthorized parties likely would not have been able to access Defendants' systems, and the Data Breach would have been prevented or much smaller in scope.

### 1. Defendants Failed to Comply with FTC Guidelines.

122. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[61]

123. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive Private Information is an "unfair practice" in violation of the Federal Trade Commission Act ("FTC Act" or "FTCA"), 15 U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.,* 799 F.3d 236, 248 (3d Cir. 2015).

124. In 2016, the FTC updated its publication titled *Protecting Private Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines recommend that:

    i. Businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it;"

    ii. Businesses should encrypt sensitive Private Information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

    iii. Businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

---

[61] *Start with Security: A Guide for Business,* FTC (Aug. 2023), https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.

    iv. Businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

    v. Businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.[62]

125. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

126. The FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the FTC Act.

127. Indeed, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

128. As evidenced by the Data Breach, Defendants failed to properly implement one or more of the basic data security practices recommended by the FTC. Defendants' failure to employ reasonable and appropriate data security measures to protect against unauthorized access to individuals' Private Information constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

129. Further, Defendants failed to follow the FTC's recommendation that companies verify that third-party service providers have implemented reasonable security measures.[63]

---

[62] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016) https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business-0

[63] *Id.*

## 2. Defendants Failed to Comply with Industry Standards.

130. As noted above, experts studying cyber security routinely identify entities in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

131. The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[64]

132. NIST provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[65]

133. NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[66]

134. NIST recommends certain practices to safeguard systems, such as the following:

        a. Control who logs on to your network and uses your computers and

---

[64] Center for Internet Security, *The 18 CIS Critical Security Controls*, https://www.cisecurity.org/controls/ciscontrols.

[65] *Framework for Improving Critical Infrastructure Cybersecurity*, NATIONAL INSTITUTE OF STANDARDS & TECHNOLOGY (Apr. 16, 2018) App'x A, Table 2, *available at* https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

[66] *Id.* at Table 2, 26-43.

other devices.

  b. Use security software to protect data.

  c. Encrypt sensitive data, at rest and in transit.

  d. Conduct regular backups of data.

  e. Update security software regularly, automating those updates if possible.

  f. Have formal policies for safely disposing of electronic files and old devices.

  g. Train everyone who uses your computers, devices, and network about cybersecurity.

135. Further still, the United States Cybersecurity and Infrastructure Security Agency ("CISA") makes specific recommendations to organizations to guard against cybersecurity attacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[67]

136. Upon information and belief, Defendants failed to implement industry-

---

[67] *Shields Up: Guidance for Organizations*, CISA, https://www.cisa.gov/shields-guidance-organizations.

standard cybersecurity measures, or to require the same from their vendor, including failing to meet or require the minimum standards of the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiffs' and Class Members' Private Information, resulting in the Data Breach.

137. These foregoing frameworks are existing and applicable industry standards for a business's obligations to provide adequate data security for its customers' sensitive information. Defendants failed to comply with at least one, or all, of these accepted standards, thereby opening the door to ShinyHunters criminals to carry out the Data Breach.

138. Further, proper vetting and routine audits of vendors' data security practices, including vetting of Salesforce's cybersecurity practices, could have prevented the Data Breach. Vendor risk assessments or security questionnaires are "one of the best methods for extracting deep cybersecurity insights about any aspects of a vendor's attack surface."[68]

139. Finally, several best practices have been identified that a minimum should be implemented by businesses in possession of Private Information, like Defendants, including but not limited to educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multifactor authentication; backup data and limiting which employees can access sensitive data. Upon information and belief, Defendants

---

[68] Edward Kost, *How to Identify Vulnerable Third-Party Software (Quickly)*, UpGuard (July 4, 2025), *available at* https://www.upguard.com/blog/how-to-identify-vulnerable-third-party-software.

CONSOLIDATED CLASS ACTION COMPLAINT                                    34

failed to follow these industry best practices, including a failure to implement encryption, strong passwords, and multi-factor authentication.

### 3. Defendants Breached Their Duty to Safeguard Plaintiffs' and Class Members' Private Information.

140. In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their own and/or their vendor's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons, especially notorious cybercriminals like ShinyHunters and Scattered Spider.

141. Defendants owed a duty to Plaintiffs and Class Members to provide reasonable security, including data security consistent with industry standards and requirements, and to ensure that their and all their vendors' computer systems, networks, and protocols adequately protected Plaintiffs' and Class Members' Private Information.

142. Defendants owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in their possession, including adequately training their employees and vendors who accessed Private Information within their computer systems on how to adequately protect Private Information.

143. Defendants owed a duty to Plaintiffs and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

144. Defendants owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

145. Defendants owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

146. Defendants owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

147. Defendants breached their obligations to Plaintiffs and Class Members

and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems, servers, and data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

   a. Failing to maintain adequate data security systems that would reduce the risk of data breaches and cyberattacks;

   b. Failing to adequately protect their customers' Private Information;

   c. Failing to properly monitor their data security systems for existing intrusions;

   d. Failing to sufficiently train their employees regarding the proper handling of their clients' Private Information;

   e. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA; and

   f. Otherwise breaching their duties and obligations to protect Plaintiffs' and Class Members' Private Information.

148. Defendants negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cybercriminals to access their computer networks and systems, which contained unsecured and unencrypted Private Information.

149. Had Defendants remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, they could have prevented intrusion into their information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' Private Information.

**L.   Plaintiffs and Class Members Suffered Injury**

150. For the reasons mentioned above, Defendants' conduct, which allowed the Data Breach to occur, caused Plaintiffs and Class Members significant injuries and harm in several ways. Plaintiffs and Class Members must immediately devote time, energy, and money to: (1) closely monitor their bills, records, and credit and financial accounts;

CONSOLIDATED CLASS ACTION COMPLAINT                                          36

(2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

151.   Once Private Information is exposed, there is virtually no way to recover the data or prevent future misuse. This is especially true here, where the information stolen during the Data Breach has been leaked on the Dark Web and remains available to download. As a result, Plaintiffs and Class Members must maintain heightened vigilance indefinitely. Further, Plaintiffs and Class Members have not been compensated for the unconsented and unauthorized disclosure of their Private Information, for which there is a robust market.

152.   Reports have already discussed the likelihood that the threat actors are "transferring or selling stolen data to other cybercriminals who then exploit it for extortion, resale, or additional attacks."[69]

153.   As a direct result of the Data Breach, Plaintiffs and Class Members have suffered and will continue to suffer economic and other concrete harms, including but not limited to:

    a.  Unauthorized disclosure of their confidential information;

    b.  Loss of the control of their Private Information;

    c.  Loss of the benefit of their bargain in choosing organizations promising data protection;

    d.  Identity theft, fraud, and misuse of financial information;

    e.  Out-of-pocket expenses for credit monitoring, mitigation efforts, and fraud prevention tools;

---

[69] Henry Martin & Peter Chittum, *Salesforce Hardens Connected Apps Security Amid Social Engineering Attacks*, Salesforce Ben (Aug. 21, 2025), *available at* https://www.salesforceben.com/salesforce-hardens-connected-apps-security-amid-social-engineering-attacks/.

---

    f.  Unauthorized charges and restricted access to financial accounts;

    g.  Emotional distress, anxiety, and loss of privacy;

    h.  Time and productivity lost dealing with the consequences of the breach;

    i.  Damage to credit scores, including from fraudulent inquiries; and

    j.  Continued and imminent risk of future fraud and identity theft due to their data being in the hands of unauthorized third parties.

154.   Individuals suffer harm each time their personal data is compromised and circulated on underground markets—even if they have been affected by prior breaches. The Dark Web contains vast, fragmented repositories of stolen information that can be aggregated by different criminals for varied forms of fraud. Each subsequent breach increases the likelihood that a victim's sensitive data will be accessed by more actors and exploited in new and damaging ways.

155.   Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. There may also be a significant time lag between when Private Information is stolen and when it is misused for fraudulent purposes.

156.   Plaintiffs and Class Members place significant value on data security and consider a company's ability to protect Private Information a key factor in their purchasing decisions. Many consumers are willing to pay more for services from organizations that demonstrate strong cybersecurity practices. Conversely, consumers are far less likely to share personal data with companies that have suffered a data breach—reflecting the reputational damage and business consequences that flow from failing to safeguard sensitive information.

157.   Because of the premium consumers place on data privacy, companies with robust security practices are viewed more favorably and can command higher prices than those that do not. Had Defendants' customers, including Plaintiffs, known the truth

CONSOLIDATED CLASS ACTION COMPLAINT          38

about Defendants' lack of cybersecurity—or that Defendants entrusted their sensitive data to an entity with inadequate security practices—they would not have used or enrolled in Defendants' policies or services; paid less; or otherwise sought alternative arrangements for services. As a result, Plaintiffs and Class Members were deprived of the benefit of their bargain, having paid for secure and responsible handling of their Private Information but receiving substantially less in return.

158. By collecting and storing Plaintiffs' and Class Members' sensitive information, Defendants undertook a duty to safeguard it and avoid increasing the risk of identity theft or fraud. Because Defendants failed to uphold that duty, Plaintiffs seek the present value of identity protection services and other compensatory measures to address the current and future harm stemming from the Data Breach.

159. Additionally, Plaintiffs and Class Members are entitled to recover the reasonable use value of their Private Information that was accessed and exfiltrated without authorization. This form of compensation mirrors damages awarded in intellectual property cases for unauthorized use of intangible assets. As with a patent or trade secret, Private Information is non-rivalrous: their unauthorized use by a third-party does not eliminate the owner's ability to use them but still justifies compensation based on market value.

160. Defendants' nearly three-month delayed and incomplete notice of the Data Breach caused additional harm to Plaintiffs and Class Members. The communication failed to disclose critical information, including the scope of the Breach, the exact nature of the information stolen, the third-party application that was breached, the number of individuals affected, and the identity of the threat actors—despite the fact that the stolen data was obtained by a well-known ransomware gang ShinyHunters. This lack of transparency has deprived victims of the ability to take timely, informed, and proactive measures to mitigate harm caused by the Data Breach.

161. Upon information and belief, Defendants continue to retain the Private Information of Plaintiffs and Class Members. As long as Defendants maintain

possession of this information, Plaintiffs and Class Members have a strong and ongoing interest in ensuring that adequate safeguards are in place to prevent further unauthorized access or disclosure.

## V.   ALLEGATIONS RELATING TO PLAINTIFFS

### A.   Plaintiff Michael McCulloch

162.   Plaintiff McCulloch obtained insurance from Defendants through Farmers Insurance Exchange.

163.   As a prerequisite to receive insurance products and services, Plaintiff McCulloch was required to disclose his Private Information to Defendants. Defendants then retained his Private Information.

164.   Plaintiff McCulloch is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. Indeed, he takes many steps to secure his Private Information including, *inter alia*: shredding or otherwise destroying documents with his private information when no longer needed; using strong passwords for his online accounts; and monitoring his credit report.

165.   Plaintiff McCulloch provided his Private Information to Defendants and trusted they would use reasonable measures to protect it according to their internal policies, as well as state and federal law. Defendants obtained and continue to maintain his Private Information and have a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

166.   Plaintiff McCulloch reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of his Private Information.

167.   Apart from this Data Breach, Plaintiff McCulloch does not recall ever learning that his information was compromised in another data breach.

168.   Plaintiff McCulloch received a data breach notice letter from Defendants dated August 22, 2025.

169. As a result, Plaintiff McCulloch was injured by Defendants and their Data Breach.

170. On information and belief, Plaintiff McCulloch's Private Information has already been published—or will be published imminently—on the Dark Web by the cybercriminals involved in the Data Breach.

171. Plaintiff McCulloch has spent—and will continue to spend—significant time and effort attempting to mitigate the risks of identity theft and fraud created by the Data Breach.

172. Thus far, Plaintiff McCulloch has lost approximately forty (40) hours attempting to mitigate the risks created by the Data Breach by monitoring his accounts for suspicious activity; contacting credit bureaus; and changing his passwords.

173. Plaintiff McCulloch has suffered substantial emotional distress because his Private Information was exposed to cybercriminals during the Data Breach. Plaintiff McCulloch is now terrified of cybercriminals using the Private Information obtained during the Data Breach to steal his identity and commit fraud.

174. Plaintiff McCulloch suffered an actionable invasion of privacy when his Private Information was exposed to nefarious cybercriminals during the Data breach.

175. Plaintiff McCulloch suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property which Defendants were required to adequately protect.

176. As a policyholder, Plaintiff McCulloch suffered actual injury and lost the "benefit of the bargain" because Plaintiff McCulloch paid Defendants for insurance and reasonable data security—but Defendants then cut corners and declined to provide the bargained for data security. After all, if Defendants were transparent about their deficient data security, then Plaintiff McCulloch (1) would have either declined to become a customer of Defendants and would have taken his business to a competitor, or (2) would have become a customer of Defendants only if they reduced their prices to account for the deficient data security.

CONSOLIDATED CLASS ACTION COMPLAINT                                                    41

177.   Plaintiff McCulloch suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because the Data Breach placed his Private Information right in the hands of criminals.

178.   Today, Plaintiff McCulloch has a continuing interest in ensuring that his Private Information—which, on information and belief, is still maintained and inadequately secured by Defendants—is protected and safeguarded from additional breaches.  Plaintiff McCulloch represents similarly situated Class Members.

**B.     Plaintiff Christina Scorio**

179.   Plaintiff Scorio obtained insurance from Defendants through Truck Insurance Exchange and Farmers Insurance Exchange and thus has paid Defendants for insurance products and services.

180.   As a prerequisite to receive insurance products and services, Plaintiff Scorio was required to disclose her Private Information to Defendants. Defendants then retained her Private Information.

181.   Thus, Plaintiff Scorio disclosed her Private Information to Defendants including at least her driver's license number, date of birth, address, and her Social Security number.

182.   Plaintiff Scorio also disclosed to Defendants her phone number and financial account information, including credit card numbers.

183.   Plaintiff Scorio is very careful about the privacy and security of her Private Information. She does not knowingly transmit her Private Information over the internet in an unsafe manner. Indeed, she takes many steps to secure her Private Information including, *inter alia*: keeping documents with her private information in a secure location; shredding or otherwise destroying documents with her private information when no longer needed; and using strong passwords for her online accounts.

184.   Plaintiff Scorio provided her Private Information to Defendants and trusted the company would use reasonable measures to protect it according to their internal policies, as well as state and federal law. Defendants obtained and continue to maintain

her Private Information and have a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

185. Plaintiff Scorio reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of Private Information.

186. Plaintiff Scorio received a data breach notice from Defendants dated August 22, 2025. The notice confirmed that the Private Information of Plaintiff Scorio was compromised including her name, driver's license number, date of birth, and the last four digits of her Social Security number.

187. As a result, Plaintiff Scorio was injured by Defendants and their Data Breach.

188. On information and belief, Plaintiff Scorio's Private Information has already been published—or will be published imminently—on the Dark Web by the cybercriminals involved in the Data Breach.

189. Plaintiff Scorio has spent—and will continue to spend—significant time and effort attempting to mitigate the risks of identity theft and fraud created by the Data Breach.

190. Thus far, Plaintiff Scorio has lost over thirty (20) hours attempting to mitigate the risks created by the Data Breach by monitoring her accounts for suspicious activity; researching the Data Breach; contacting her bank; contacting credit bureaus; changing her password; investigating fraud; and traveling three (3) miles to her bank to implement further security measures with her account.

191. To make matters worse, Plaintiff Scorio already suffered from the misuse of her Private Information whereby cybercriminals stole her identity and placed fraudulent charges on her bank account for approximately $100 in the summer of 2025.

192. In the aftermath of the Data Breach, Plaintiff Scorio also suffered from a spike in suspicious and targeted phishing phone calls.

193. Plaintiff Scorio has suffered substantial emotional distress because her

Private Information was exposed to cybercriminals during the Data Breach. Plaintiff Scorio is now terrified of cybercriminals using the Private Information obtained during the Data Breach to steal her identity and commit fraud.

194. Plaintiff Scorio suffered an actionable invasion of privacy when her Private Information was exposed to nefarious cybercriminals during the Data breach.

195. Plaintiff Scorio suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property which Defendants were required to adequately protect.

196. As a policyholder, Plaintiff Scorio suffered actual injury and lost the "benefit of the bargain" because Plaintiff paid Defendants for insurance and reasonable data security—but Defendants then cut corners and declined to provide the bargained for data security. After all, if Defendants were transparent about their deficient data security, then Plaintiff (1) would have either declined to become a customer of Defendants and would have taken her business to a competitor, or (2) would have become a customer of Defendants only if they reduced their prices to account for the deficient data security.

197. Plaintiff Scorio suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because the Data Breach placed her Private Information right in the hands of criminals.

198. Today, Plaintiff Scorio has a continuing interest in ensuring that her Private Information—which, on information and belief, is still maintained and inadequately secured by Defendants—is protected and safeguarded from additional breaches. Plaintiff Scorio represents similarly situated Class Members.

**C.  Plaintiff Dawn Harris**

199. Plaintiff Harris obtained insurance from Defendants through Farmers Insurance Exchange and thus has paid Defendants for insurance products and services.

200. As a prerequisite to receive insurance products and services, Plaintiff Harris was required to disclose her Private Information to Defendants. Defendants then retained

her Private Information.

201.    Thus, Plaintiff Harris disclosed her Private Information to Defendants including at least her name, driver's license number, date of birth, address, and her Social Security number.

202.    Plaintiff Harris is very careful about the privacy and security of her Private Information. She does not knowingly transmit her Private Information over the internet in an unsafe manner. Indeed, she takes many steps to secure her Private Information including, *inter alia*: keeping documents with her private information in a secure location; shredding or otherwise destroying documents with her private information when no longer needed; and using strong passwords for her online accounts.

203.    Plaintiff Harris provided her Private Information to Defendants and trusted that they would use reasonable measures to protect it according to their internal policies, as well as state and federal law. Defendants obtained and continue to maintain her Private Information and have a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

204.    Plaintiff Harris reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of Private Information.

205.    Plaintiff Harris received a data breach notice from Defendants dated August 22, 2025. The notice confirmed that the Private Information of Plaintiff Harris was compromised including her name, driver's license number, date of birth, and the last four digits of her Social Security number.

206.    As a result, Plaintiff Harris was injured by Defendants and their Data Breach.

207.    On information and belief, Plaintiff Harris's Private Information has already been published—or will be published imminently—on the Dark Web by the cybercriminals involved in the Data Breach.

208.    Plaintiff Harris has spent—and will continue to spend—significant time

CONSOLIDATED CLASS ACTION COMPLAINT                                                    45

and effort attempting to mitigate the risks of identity theft and fraud created by the Data Breach.

209. Thus far, Plaintiff Harris has lost two hundred (200) hours attempting to mitigate the risks created by the Data Breach by monitoring her accounts for suspicious activity; researching the Data Breach; contacting her bank; and investigating fraud and identity theft.

210. To make matters worse, Plaintiff Harris already suffered from the misuse of her Private Information whereby cybercriminals stole her identity and opened a fraudulent credit card account through Mission Lane using her identity in or around June 2025.

211. Additionally, after the Data Breach, Plaintiff Harris already suffered from the misuse of her Private Information whereby cybercriminals stole her identity and placed a fraudulent charge of approximately $300 on her Mission Lane credit card account in or around July 2025. Plaintiff Harris closed the false account, but the fraudulent charge was not reversed. Thus, she has lost approximately $300 out-of-pocket.

212. In the aftermath of the Data Breach, Plaintiff Harris also suffered from a spike in suspicious and targeted and scam phone calls. Since the summer of 2025, she has received an average of approximately ten (10) suspicious calls per day.

213. Plaintiff Harris has suffered substantial emotional distress because her Private Information was exposed to cybercriminals during the Data Breach. Plaintiff Harris is now terrified of cybercriminals using the Private Information obtained during the Data Breach to steal her identity and commit fraud.

214. Plaintiff Harris suffered an actionable invasion of privacy when her Private Information was exposed to nefarious cybercriminals during the Data breach.

215. Plaintiff Harris suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property which Defendants were required to adequately protect.

216. As a policyholder, Plaintiff Harris suffered actual injury and lost the "benefit of the bargain" because Plaintiff paid Defendants for insurance and reasonable data security—but Defendants then cut corners and declined to provide the bargained for data security. After all, if Defendants were transparent about their deficient data security, then Plaintiff Harris (1) would have either declined to become a customer of Defendants and would have taken her business to a competitor, or (2) would have become a customer of Defendants only if they reduced their prices to account for the deficient data security.

217. Plaintiff Harris suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because the Data Breach placed her Private Information right in the hands of criminals.

218. Today, Plaintiff Harris has a continuing interest in ensuring that her Private Information—which, on information and belief, is still maintained and inadequately secured by Defendants—is protected and safeguarded from additional breaches. Plaintiff Harris represents similarly situated Class Members.

**D. Plaintiff Bobbie Jo Geelen**

219. Plaintiff Geelen obtained insurance from Defendants through Farmers' Truck Insurance Exchange and thus has paid Defendants for insurance products and services.

220. As a prerequisite to receive insurance products and services, Defendants required that Plaintiff Geelen disclose her Private Information which Defendants then retained.

221. Thus, Plaintiff Geelen disclosed her Private Information to Defendants, including at least her name, driver's license number, date of birth, and address, and financial account information.

222. Plaintiff Geelen is very careful about the privacy and security of her Private Information. She does not knowingly transmit her Private Information over the internet in an unsafe manner. Indeed, she takes many steps to secure her Private Information

including, *inter alia*: keeping documents with her private information in a secure location; shredding or otherwise destroying documents with her private information when no longer needed; using strong passwords for her online accounts; and checking her credit reports.

223. Plaintiff Geelen provided her Private Information to Defendants and trusted the company would use reasonable measures to protect it according to their internal policies, as well as state and federal law. Defendants obtained and continue to maintain her Private Information and have a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

224. Plaintiff Geelen reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of Private Information.

225. Plaintiff Geelen received a data breach notice from Defendants dated August 22, 2025. The notice confirmed that the Private Information of Plaintiff Geelen was compromised including her name, driver's license number, and date of birth.

226. As a result, Plaintiff Geelen was injured by Defendants and their Data Breach.

227. On information and belief, Plaintiff Geelen's Private Information has already been published—or will be published imminently—on the Dark Web by the cybercriminals involved in the Data Breach.

228. Plaintiff Geelen has spent—and will continue to spend—significant time and effort attempting to mitigate the risks of identity theft and fraud created by the Data Breach.

229. Thus far, Plaintiff Geelen has lost twenty-four (24) hours attempting to mitigate the risks created by the Data Breach by monitoring her accounts for suspicious activity; researching the Data Breach; contacting credit bureaus; contacting her bank; and changing her passwords.

230. After the Data Breach, and to mitigate the risks created by the Data Breach,

Plaintiff Geelen paid approximately $20 out-of-pocket to the credit bureau Experian so that she could review her credit report in detail for any suspicious activity.

231.   In the aftermath of the Data Breach, Plaintiff Geelen also suffered from a spike in suspicious and targeted and scam emails, text messages, and phone calls.

232.   Plaintiff Geelen has suffered substantial emotional distress because her Private Information was exposed to cybercriminals during the Data Breach. Plaintiff Geelen is now terrified of cybercriminals using the Private Information obtained during the Data Breach to steal her identity and commit fraud.

233.   Plaintiff Geelen suffered an actionable invasion of privacy when her Private Information was exposed to nefarious cybercriminals during the Data Breach.

234.   Plaintiff Geelen suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property which Defendants were required to adequately protect.

235.   Plaintiff Geelen suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property which Defendants were required to adequately protect.

236.   As a policyholder, Plaintiff Geelen suffered actual injury and lost the "benefit of the bargain" because Plaintiff Geelen paid Defendants for insurance and reasonable data security—but Defendants then cut corners and declined to provide the bargained for data security. After all, if Defendants were transparent about their deficient data security, then Plaintiff Geelen (1) would have either declined to become a customer of Defendants and would have taken her business to a competitor, or (2) would have become a customer of Defendants only if they reduced their prices to account for the deficient data security.

237.   Plaintiff Geelen suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because the Data Breach placed her Private Information right in the hands of criminals.

238.   Today, Plaintiff Geelen has a continuing interest in ensuring that her Private

Information—which, on information and belief, is still maintained and inadequately secured by Defendants—is protected and safeguarded from additional breaches. Plaintiff Geelen represents similarly situated Class Members.

**E.   Plaintiff Phyllis Garrison**

239.   Plaintiff Garrison obtained insurance from Defendants through Farmers Group, Inc. and thus has paid Defendants for insurance products and services.

240.   As a prerequisite to receive insurance products and services, Defendants required that Plaintiff Garrison disclose her Private Information which Defendants then retained.

241.   Thus, Plaintiff Garrison disclosed her Private Information to Defendants including at least her name, driver's license number, date of birth, address, Social Security number, and financial account information.

242.   Plaintiff Garrison is very careful about the privacy and security of her Private Information. She does not knowingly transmit her Private Information over the internet in an unsafe manner. Indeed, she takes many steps to secure her Private Information including, *inter alia*: keeping documents with her private information in a secure location; shredding or otherwise destroying documents with her private information when no longer needed; using strong passwords for her online accounts; and checking her credit reports.

243.   Plaintiff Garrison provided her Private Information to Defendants and trusted they would use reasonable measures to protect it according to their internal policies, as well as state and federal law. Defendants obtained and continue to maintain her Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

244.   Plaintiff Garrison reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of Private Information.

245.   Plaintiff Garrison received a data breach notice from Defendants dated

August 22, 2025. The notice confirmed that the Private Information of Plaintiff Garrison was compromised including her name, driver's license number, date of birth, and the last four digits of her Social Security number.

246.   As a result, Plaintiff Garrison was injured by Defendants and their Data Breach.

247.   On information and belief, Plaintiff Garrison's Private Information has already been published—or will be published imminently—on the Dark Web by the cybercriminals involved in the Data Breach.

248.   Plaintiff Garrison has spent—and will continue to spend—significant time and effort attempting to mitigate the risks of identity theft and fraud created by the Data Breach.

249.   Thus far, Plaintiff Garrison has lost thirty-six (36) hours attempting to mitigate the risks created by the Data Breach by monitoring her accounts for suspicious activity; researching the Data Breach; contacting her bank; contacting credit bureaus; and changing her passwords.

250.   Plaintiff Garrison has suffered substantial emotional distress because her Private Information was exposed to cybercriminals during the Data Breach. Plaintiff Garrison is now terrified of cybercriminals using the Private Information obtained during the Data Breach to steal her identity and commit fraud.

251.   Plaintiff Garrison suffered an actionable invasion of privacy when her Private Information was exposed to nefarious cybercriminals during the Data breach.

252.   Plaintiff Garrison suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property which Defendants were required to adequately protect.

253.   As a policyholder, Plaintiff Garrison suffered actual injury and lost the "benefit of the bargain" because Plaintiff Garrison paid Defendants for insurance and reasonable data security—but Defendants then cut corners and declined to provide the bargained for data security. After all, if Defendants were transparent about their deficient

data security, then Plaintiff Garrison (1) would have either declined to become a customer of Defendants and would have taken her business to a competitor, or (2) would have become a customer of Defendants only if Defendants reduced their prices to account for the deficient data security.

254. Plaintiff Garrison suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because the Data Breach placed her Private Information right in the hands of criminals.

255. Today, Plaintiff Garrison has a continuing interest in ensuring that her Private Information—which, on information and belief, is still maintained and inadequately secured by Defendants—is protected and safeguarded from additional breaches. Plaintiff Garrison represents similarly situated Class Members.

**F.     Plaintiff Roland Plude**

256. Plaintiff Plude obtained insurance through the Farmers Insurance Exchange and thus has paid Defendants for insurance products and services.

257. As a prerequisite to receive insurance products and services, Defendants required that Plaintiff Plude disclose his Private Information which Defendants then retained.

258. Thus, Plaintiff Plude disclosed his Private Information to Defendants including at least his name, driver's license number, date of birth, address, and his Social Security number.

259. Plaintiff Plude is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner. Indeed, he takes many steps to secure his Private Information including, *inter alia*, keeping documents with his private information in a secure location.

260. Plaintiff Plude provided his Private Information to Defendants and trusted the company would use reasonable measures to protect it according to their internal policies, as well as state and federal law. Defendants obtained and continue to maintain

his Private Information and have a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

261. Plaintiff Plude reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of Private Information.

262. Plaintiff Plude received a data breach notice from Defendants dated August 22, 2025. The notice confirmed that the Private Information of Plaintiff Plude was compromised including his name, driver's license number, date of birth, and the last four digits of his Social Security number.

263. As a result, Plaintiff Plude was injured by Defendants and their Data Breach.

264. On information and belief, Plaintiff Plude's Private Information has already been published—or will be published imminently—on the Dark Web by the cybercriminals involved in the Data Breach.

265. Plaintiff Plude has spent—and will continue to spend—significant time and effort attempting to mitigate the risks of identity theft and fraud created by the Data Breach.

266. Thus far, Plaintiff Plude has lost sixty-eight (68) hours attempting to mitigate the risks created by the Data Breach by monitoring his accounts for suspicious activity; researching the Data Breach; calling Defendants; obtaining credit freezes; researching mitigation measures; traveling to his bank to discuss the Data Breach and mitigation measures; and resetting automatic billing settings.

267. Plaintiff Plude spent approximately two and a half (2.5) hours on the phone with Defendants in an attempt to obtain the credit monitoring offered because of the Data Breach. However, Plaintiff Plude was left on hold and was thus unable to activate any credit monitoring service offered by Defendants.

268. On or around September 16, 2025, to mitigate the risks created by the Data Breach, Plaintiff Plude paid out-of-pocket approximately $300 per year for credit

monitoring services through the credit bureau Equifax.

269. Plaintiff Plude has suffered substantial emotional distress because his Private Information was exposed to cybercriminals during the Data Breach. Plaintiff Plude is now terrified of cybercriminals using the Private Information obtained during the Data Breach to steal his identity and commit fraud.

270. Plaintiff Plude suffered an actionable invasion of privacy when his Private Information was exposed to nefarious cybercriminals during the Data breach.

271. Plaintiff Plude suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property which Defendants were required to adequately protect.

272. As a policyholder, Plaintiff Plude suffered actual injury and lost the "benefit of the bargain" because Plaintiff paid Defendants for insurance and reasonable data security—but Defendants then cut corners and declined to provide the bargained for data security. After all, if Defendants were transparent about their deficient data security, then Plaintiff Plude (1) would have either declined to become a customer of Defendants and would have taken his business to a competitor, or (2) would have become a customer of Defendants only if they reduced their prices to account for the deficient data security.

273. Plaintiff Plude suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because the Data Breach placed his Private Information right in the hands of criminals.

274. Today, Plaintiff Plude has a continuing interest in ensuring that his Private Information —which, on information and belief, is still maintained and inadequately secured by Defendants—is protected and safeguarded from additional breaches. Plaintiff Plude represents similarly situated Class Members.

**G.    Plaintiff Josko Smolcic**

275. Plaintiff Smolcic obtained insurance through the Farmers Insurance Exchange and thus has paid Defendants for insurance products and services.

276. As a prerequisite to receive insurance products and services, Defendants required that Plaintiff Smolcic disclose his Private Information which Defendants then retained.

277. Thus, Plaintiff Smolcic disclosed his Private Information to Defendants including at least his name, driver's license number, date of birth, address, and his Social Security number.

278. Plaintiff Smolcic is very careful about the privacy and security of his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner.

279. Plaintiff Smolcic provided his Private Information to Defendants and trusted the company would use reasonable measures to protect it according to their internal policies, as well as state and federal law. Defendants obtained and continue to maintain his Private Information and have a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

280. Plaintiff Smolcic reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of Private Information.

281. Apart from this Data Breach, Plaintiff Smolcic does not recall ever learning that his information was compromised in another data breach.

282. Plaintiff Smolcic received an official data breach notice from Defendants.

283. As a result, Plaintiff Smolcic was injured by Defendants and their Data Breach.

284. On information and belief, Plaintiff Smolcic's Private Information has already been published—or will be published imminently—on the Dark Web by the cybercriminals involved in the Data Breach.

285. Plaintiff Smolcic has spent—and will continue to spend—significant time and effort attempting to mitigate the risks of identity theft and fraud created by the Data Breach.

286.   Thus far, Plaintiff Smolcic has lost approximately one hundred (100) hours attempting to mitigate the risks created by the Data Breach by researching the Data Breach, monitoring his accounts, communicating with legal counsel, and reviewing his credit.

287.   In the aftermath of the Data Breach, Plaintiff Smolcic also suffered from a spike in suspicious and targeted and scam text messages and phone calls.

288.   Plaintiff Smolcic has suffered substantial emotional distress because his Private Information was exposed to cybercriminals during the Data Breach. Plaintiff is now terrified of cybercriminals using the Private Information obtained during the Data Breach to steal his identity and commit fraud.

289.   Plaintiff Smolcic suffered an actionable invasion of privacy when his Private Information was exposed to nefarious cybercriminals during the Data breach.

290.   Plaintiff Smolcic suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property which Defendants were required to adequately protect.

291.   As a policyholder, Plaintiff Smolcic suffered actual injury and lost the "benefit of the bargain" because Plaintiff paid Defendants for insurance and reasonable data security—but Defendants then cut corners and declined to provide the bargained for data security. After all, if Defendants were transparent about their deficient data security, then Plaintiff Smolcic (1) would have either declined to become a customer of Defendants and would have taken his business to a competitor, or (2) would have become a customer Defendants only if they reduced their prices to account for the deficient data security.

292.   Plaintiff Smolcic suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because the Data Breach placed his Private Information right in the hands of criminals.

293.   Today, Plaintiff Smolcic has a continuing interest in ensuring that his Private Information—which, on information and belief, is still maintained and

CONSOLIDATED CLASS ACTION COMPLAINT                                                    56

inadequately secured by Defendants—is protected and safeguarded from additional breaches. Plaintiff Smolcic represents similarly situated Class Members.

### H. Plaintiff Jacqulyn McGlynn

294. Plaintiff McGlynn obtained insurance from Defendants through the Farmers Insurance Exchange and thus has paid Defendants for insurance products and services.

295. As a prerequisite to receive insurance products and services, Defendants required that Plaintiff McGlynn disclose her Private Information which Defendants then retained.

296. Thus, Plaintiff McGlynn disclosed her Private Information to Defendants including at least her name, driver's license number, date of birth, address, and her Social Security number.

297. Plaintiff McGlynn is very careful about the privacy and security of her Private Information. She does not knowingly transmit her Private Information over the internet in an unsafe manner. Indeed, she takes many steps to secure her Private Information.

298. Plaintiff McGlynn provided her Private Information to Defendants and trusted the company would use reasonable measures to protect it according to their internal policies, as well as state and federal law. Defendants obtained and continue to maintain her Private Information and has a continuing legal duty and obligation to protect that Private Information from unauthorized access and disclosure.

299. Plaintiff McGlynn reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of Private Information.

300. Plaintiff McGlynn received a data breach notice from Defendants dated August 22, 2025. The notice confirmed that the Private Information of Plaintiff McGlynn was compromised including her name, driver's license number, date of birth, and the last four digits of her Social Security number.

301.   As a result, Plaintiff McGlynn was injured by Defendants and their Data Breach.

302.   In or around August 2025, Plaintiff McGlynn was notified by her identity monitoring service McAfee that her Private Information was found leaked on the Dark Web.

303.   On information and belief, Plaintiff McGlynn's Private Information has already been published—or will be published imminently—on the Dark Web by the cybercriminals involved in the Data Breach.

304.   Plaintiff McGlynn has spent—and will continue to spend—significant time and effort attempting to mitigate the risks of identity theft and fraud created by the Data Breach.

305.   Thus far, Plaintiff McGlynn has lost 50 hours attempting to mitigate the risks created by the Data Breach by monitoring her accounts for suspicious activity; researching the Data Breach; contacting her bank; and changing her passwords.

306.   After the Data Breach, and to mitigate the risks created by the Data Breach, Plaintiff McGlynn paid approximately $175 out-of-pocket for traveling to her bank to address the Data Breach, paying for identity monitoring services with McAfee, and paying for identity theft protection insurance.

307.   Plaintiff McGlynn was notified by her credit monitoring service that her Private Information was found leaked on the Dark Web by cybercriminals in or around August 2025.

308.   Plaintiff McGlynn has suffered substantial emotional distress because her Private Information was exposed to cybercriminals during the Data Breach. Plaintiff McGlynn is now terrified of cybercriminals using the Private Information obtained during the Data Breach to steal her identity and commit fraud. The fear created by the Data Breach has physically manifested as increased blood pressure.

309.   Plaintiff McGlynn suffered an actionable invasion of privacy when her Private Information was exposed to nefarious cybercriminals during the Data breach.

310.   Plaintiff McGlynn suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property which Defendants were required to adequately protect.

311.   As a policyholder, Plaintiff McGlynn suffered actual injury and lost the "benefit of the bargain" because Plaintiff McGlynn paid Defendants for insurance and reasonable data security—but Defendants then cut corners and declined to provide the bargained for data security. After all, if Defendants were transparent about their deficient data security, then Plaintiff McGlynn (1) would have either declined to become a customer of Defendants and would have taken her business to a competitor, or (2) would have become a customer of Defendants only if they reduced their prices to account for the deficient data security.

312.   Plaintiff McGlynn suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because the Data Breach placed her Private Information right in the hands of criminals.

313.   Today, Plaintiff McGlynn has a continuing interest in ensuring that her Private Information—which, on information and belief, is still maintained and inadequately secured by Defendants—is protected and safeguarded from additional breaches. Plaintiff McGlynn represents similarly situated Class Members.

VI.   **CLASS ACTION ALLEGATIONS**

314.   Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

315.   The Classes that Plaintiffs seek to represent are defined as follows:

**1.      The Nationwide Class**

316.   Plaintiffs seek a class certification of a claim for violation of federal and common law claims on behalf of the Nationwide class defined as follows:

> All individuals residing in the United States whose Private Information was compromised in the Defendants' Data Breach, which occurred on or around May 29, 2025, including all those individuals who received notice of the Data Breach.

CONSOLIDATED CLASS ACTION COMPLAINT                                        59

## 2.    The California Subclass

317.    Plaintiff Dawn Harris seeks a class certification of a claim for violations of the California Unfair Competition Law, Cal. Civ. Code §§ 17200 *et seq.* ("UCL"), the California Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 *et seq.* ("CCPA"), the California Customer Records Act under Cal. Civ. Code §§ 1798.80 *et seq.* ("CRA"), and for invasion of privacy under the California Constitution, Art. 1 § 1, on behalf of herself and the California subclass defined as follows:

> All individuals residing in the State of California whose Private Information was compromised in the Defendants' Data Breach, which occurred on or around May 29, 2025, including all those individuals who received notice of the Data Breach.

## 3.    The Michigan Subclass

318.    Plaintiff Michael McCulloch seeks a class certification of a claim for violation of the Michigan Consumer Protection Act under Mich. Comp. Laws §§ 445.903 *et seq.*, on behalf of himself and the Michigan subclass defined as follows:

> All individuals residing in the State of Michigan whose Private Information was compromised in the Defendants' Data Breach, which occurred on or around May 29, 2025, including all those individuals who received notice of the Data Breach.

## 4.    The Nebraska Subclass

319.    Plaintiff Phyllis Garrison seeks a class certification of a claim for violation of the Nebraska Consumer Protection Act under Neb. Rev. Stat. §§ 59-1601 *et seq.*, and the Nebraska Uniform Deceptive Trade Practices Act under Neb. Rev. Stat. §§ 87-301 *et seq.*, on behalf of herself and the Nebraska subclass defined as follows:

> All individuals residing in the State of Nebraska whose Private Information was compromised in the Defendants' Data Breach, which occurred on or around May 29, 2025, including all those individuals who received notice of the Data Breach.

## 5.    The New Jersey Subclass

320.    Plaintiff Christina Scorio seeks a class certification of a claim for violation of the New Jersey Customer Security Breach Disclosure Act under N.J. Stat. Ann. §§ 56:8-163 *et seq.*, and New Jersey Consumer Fraud Act under N.J. Stat. Ann. §§ 56:8-1 *et seq.*, on behalf of herself and the New Jersey subclass defined as follows:

> All individuals residing in the State of New Jersey whose Private Information was compromised in the Defendants' Data Breach, which occurred on or around May 29, 2025, including all those individuals who received notice of the Data Breach.

## 6.    The Pennsylvania Subclass

321.    Plaintiff Bobbie Jo Geelen seeks a class certification of a claim for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law 73 a. Cons. Stat. §§ 201-2 *et seq.*, on behalf of herself and the Pennsylvania subclass defined as follows:

> All individuals residing in the State of Pennsylvania whose Private Information was compromised in the Defendants' Data Breach, which occurred on or around May 29, 2025, including all those individuals who received notice of the Data Breach.

## 7.    The Texas Subclass

322.    Plaintiffs Roland Plude, Josko Smolcic, and Jacqulyn McGlynn seek a class certification of a claim for violation of the Texas Deceptive Trade Practices–Consumer Protection Act, Texas Bus. & Com. Code §§ 17.41 *et seq.*, on behalf of themselves and the Texas subclass defined as follows:

> All individuals residing in the State of Texas whose Private Information was compromised in the Defendants' Data Breach, which occurred on or around May 29, 2025, including all those individuals who received notice of the Data Breach.

323.    The above Nationwide Class and State Subclasses are herein referred to

collectively as the "Class." Excluded from the Class are: (1) any Judge presiding over this action, members of their immediate families, and Court Staff; and (2) Defendants, their subsidiaries, parent companies, successors, predecessors, and any entity in which Defendants, or their parents, have a controlling interest, and their current or former officers and directors.

324. **Numerosity**: While the precise number of Class members has not yet been determined, members of the Class are so numerous that their individual joinder is impracticable, as the proposed Class appears to include approximately 1.1 million members who are geographically dispersed.

325. **Typicality**: Plaintiffs' claims are typical of Class members' claims. Plaintiffs and all Class members were injured through Defendants' uniform misconduct, and Plaintiffs' claims are identical to the claims of the Class members they seek to represent. Accordingly, Plaintiffs' claims are typical of Class members' claims.

326. **Adequacy**: Plaintiffs' interests are aligned with the Class whom Plaintiffs seek to represent, and Plaintiffs have retained counsel with significant experience prosecuting complex class action cases, including cases involving alleged privacy and data security violations. Plaintiffs and undersigned counsel intend to prosecute this action vigorously. The Class's interests are well-represented by Plaintiffs and undersigned counsel.

327. **Superiority**: A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiffs; and other Class members' claims. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for Class members individually to effectively redress Defendants' wrongdoing. Even if Class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system,

presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

328. **Commonality and Predominance:** The following questions common to all Class members predominate over any potential questions affecting individual Class members:

- whether Defendants engaged in the wrongful conduct alleged herein;
- whether Defendants' data security practices resulted in the disclosure of Plaintiffs' and other Class members' Personal Information and the Data Breach;
- whether Defendants violated privacy rights and invaded Plaintiffs' and Class members' privacy;
- whether Defendants violated the consumer protection statutes as alleged herein; and
- whether Plaintiffs and Class members are entitled to damages, equitable relief, or other relief and, if so, in what amount.

329. Given that Defendants engaged in a common course of conduct as to Plaintiffs and the Class, similar or identical injuries and common law and statutory violations are involved, and common questions outweigh any potential individual questions.

330. **Injunctive and Declaratory Relief:** Consistent with Fed. R. Civ. P. 23(b)(2), Defendants, through their conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

## VII.  CLAIMS FOR RELIEF

### A.    NATIONWIDE CLAIMS

### COUNT I
### NEGLIGENCE
**(Against all Defendants by Plaintiffs on Behalf of Themselves
and the Nationwide Class, or in the Alternative, by Plaintiffs
on Behalf of Themselves and Their Corresponding State Subclass)**

331.  Plaintiffs replead and incorporate by reference Paragraphs 1-330 as if set forth herein.

332.  Defendants were entrusted with, stored, and otherwise had access to the Personal Information of Plaintiffs and Class Members.

333.  Defendants knew, or should have known, of the risks inherent to storing the Personal Information of Plaintiffs and Class Members, and to not ensuring that their or their vendors' servers and systems, and the Personal Information, were secure. These risks were reasonably foreseeable to Defendants.

334.  Defendants owed duties of care to Plaintiffs and Class Members whose Personal Information had been entrusted to Defendants.

335.  Defendants breached their duties to Plaintiffs and Class Members by failing to provide fair, reasonable, or adequate data security. Defendants had a duty to safeguard Plaintiffs' and Class Members' Personal Information and to ensure that they adequately protected Personal Information. Defendants breached this duty.

336.  Defendants' duty of care arises from their knowledge that their customers entrust them with highly sensitive Personal Information that Defendants are required to, and represent that they will, handle securely. Indeed, on their website, Defendants commit to data privacy in their Privacy Notices, which include safeguarding sensitive Personal Information.

337.  Only Defendants were in a position to ensure that they and their third-party vendors' systems, servers, and services were sufficient to protect against breaches and the harms that Plaintiffs and Class Members have now suffered.

CONSOLIDATED CLASS ACTION COMPLAINT                                    64

338. A "special relationship" exists between Defendants, on the one hand, and Plaintiffs and Class Members, on the other hand. Defendants entered into a "special relationship" with Plaintiffs and Class Members by agree to accept, store, and have access to sensitive Personal Information provided by Plaintiffs and Class Members in connections with their attempts or efforts to secure insurance.

339. But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

340. Defendants acted with wanton disregard for the security of Plaintiffs' and Class Members' Personal Information.

341. The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendants' breach of duties. Defendants knew or should have known they were failing to meet these duties, and that Defendants' breach would cause Plaintiffs and Class Members to experience foreseeable harms associated with the exposure of their Personal Information.

342. As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have been harmed and face an imminent and ongoing risk of harm.

343. As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to damages in the amount to be proven at trial.

## COUNT II
## NEGLIGENCE PER SE
**(Against all Defendants by Plaintiffs on Behalf of Themselves
and the Nationwide Class, or in the Alternative, by Plaintiffs
on Behalf of Themselves and Their Corresponding State Subclass)**

344. Plaintiffs replead and incorporate by reference Paragraphs 1-330 as if set forth herein.

345. Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45),

Defendants had a duty to provide adequate data security practices in connection with safeguarding Plaintiffs' and Class Members' Personal Information.

346.  Defendants breached their duties to Plaintiffs and Class Members under the Federal Trade Commission Act (15 U.S.C. §45), the Gramm-Leach-Bliley Act (15 U.S.C. §§ 6801 *et seq.*)("GLBA), the Driver's Privacy Protection Action, 18 U.S.C. §§ 2724 *et seq.* ("DPPA), among other statutes, by failing to provide fair, reasonable, or adequate data security in connection with the sale of insurance products and services in order to safeguard Plaintiffs' and Class Members' Personal Information.

347.  Defendants' failure to comply with applicable laws and regulations constitutes negligence per se.

348.  But for Defendants' wrongful and negligent breach of duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

349.  The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendants' breach of duties. Defendants knew or should have known that they were failing to meet their duties, and that a breach would cause Plaintiffs and Class Members to experience the foreseeable harm associated with the exposure of their Personal Information.

350.  As a direct and proximate result of Defendants' negligence per se, Plaintiffs and Class Members have been harmed and face imminent and ongoing risk of harm.

351.  As a direct and proximate result of Defendants' negligence per se, Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(Against all Defendants by Plaintiffs on Behalf of Themselves**
**and the Nationwide Class, or in the Alternative, by Plaintiffs**
**on Behalf of Themselves and Their Corresponding State Subclass)**

352.  Plaintiffs replead and incorporate by reference Paragraphs 1-330 as if set

forth herein.

353. Defendants provided or provide insurance products and services to Plaintiffs and Class Members, or Plaintiffs and Class Members provided their Personal Information to Defendants as prospective customers or in some other capacity.

354. In connection with their business relationship, Plaintiffs and Class Members entered into implied contracts with Defendants.

355. Pursuant to these implied contracts, Plaintiffs and Class Members provided Defendants with their Personal Information. In exchange, Defendants agreed, among other things: (1) to take reasonable measure to protect the security and confidentiality of Plaintiffs' and Class Members' Personal Information; and (2) to protect Plaintiffs' and Class Members' Personal Information in compliance with federal and state laws and regulations and industry standards.

356. The protection of Personal Information was a material terms of the implied contracts between Plaintiffs and Class Members, on the one hand, and Defendants, on the other hand. Had Plaintiffs and Class Members known that Defendants would not adequately protect customers' Personal Information they would not have done business with Defendants.

357. Plaintiffs and Class Members performed their obligations under the implied contract when they provided Defendants with their Personal Information.

358. Necessarily implicit in the agreements between Plaintiffs/Class Members and Defendants was Defendants' obligation to take reasonable steps to secure and safeguard Plaintiffs' and Class Members' Personal Information.

359. Defendants breached their obligations under their implied contracts with Plaintiffs and Class Members by failing to implement and maintain reasonable security measures to protect their Personal Information.

360. Defendants' breach of their obligations of their implied contracts with Plaintiffs and Class Members directly resulted in the Data Breach.

361. The damages sustained by Plaintiffs and Class Members as described above

were the direct and proximate result of Defendants' material breaches of their agreements.

362. Plaintiffs and other Class Members were damaged by Defendants' breach of implied contracts because: (i) they have suffered actual harm or identity theft; (ii) they face substantially increased risk of Identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their Personal Information was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their Personal Information has been breached; (v) they were deprived of the value of their Personal Information, for which there is a well-established national and international market; (vi) they were deprived of the benefit of their bargain; and or (vii) they lost time and money incurred to mitigate and remediate the effects of the breach, including the increased risks of identity theft they face and will continue to face.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
**(Against all Defendants by Plaintiffs on Behalf of Themselves
and the Nationwide Class, or in the Alternative, by Plaintiffs
on Behalf of Themselves and Their Corresponding State Subclass)**

363. Plaintiffs replead and incorporate by reference Paragraphs 1-330 as if set forth herein.

364. Plaintiffs bring this claim individually and on behalf of the Class.

365. Plaintiffs and Class Members have an interest, both equitable and legal, in the Private Information about them that was conveyed to, collected by, and maintained by Defendants and that was ultimately accessed or compromised in the Data Breach.

366. As a recipient of Plaintiffs' and Class Members' Private Information, Defendants have a fiduciary relationship to Plaintiffs and the Class Members.

367. Because of that fiduciary relationship, Defendants were provided with and stored private and valuable Private Information related to Plaintiffs and the Class. Plaintiffs and the Class were entitled to expect their information would remain confidential while in Defendants' possession.

368.  Defendants owed a fiduciary duty under common law to Plaintiffs and Class Members to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in Defendants' possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

369.  As a result of the parties' fiduciary relationship, Defendants had an obligation to maintain the confidentiality of the information within Plaintiffs' and the Class Members' records.

370.  Defendants had possession and knowledge of the Private Information of Plaintiffs and Class Members, information not generally known.

371.  Plaintiffs and Class Members did not consent to or authorize Defendants to release or disclose their Private Information to unknown criminal actors.

372.  Defendants breached their fiduciary duties owed to Plaintiffs and Class Members by, among other things: mismanaging their system, including the systemic entrustment of the Private Information to a vendor, and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of Private Information; mishandling data security by failing to assess the sufficiency of their safeguards in place to control these risks; failing to design and implement information safeguards to control these risks; failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; failing to evaluate and adjust information security programs in light of the circumstances alleged herein; failing to detect the breach the day it began; and failing to follow one or more of their own privacy policies and practices published to Plaintiffs and Class Members.

373.  But for Defendants' wrongful breach of their fiduciary duties owed to Plaintiffs and Class Members, their Private Information would not have been compromised.

374.  As a direct and proximate result of Defendants' breach of fiduciary duty,

Plaintiffs and Class Members have suffered injuries, including:

    a.  Theft of their Private Information;

    b.  Costs associated with the detection and prevention of identity theft and unauthorized use of their Private Information;

    c.  Costs associated with purchasing credit monitoring and identity theft protection services;

    d.  Lowered credit scores resulting from credit inquiries following fraudulent activities;

    e.  Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

    f.  The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

    g.  Damages to and diminution in value of their Private Information entrusted, directly or indirectly, to with the mutual understanding that Defendants would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others;

    h.  Continued risk of exposure to hackers and thieves of their Private Information, which remains in Defendants' possession and is subject to further breaches so long as Defendants fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data; and

i. Emotional distress from the unauthorized disclosure of Private Information to strangers who have criminal intentions and now have opportunities to commit identity theft, fraud, and other types of attacks on Plaintiffs and Class Members.

375.  As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**COUNT V**
**BREACH OF THE IMPLIED COVENANT**
**OF GOOD FAITH AND FAIR DEALING**
**(Against all Defendants by Plaintiffs on Behalf of Themselves**
**and the Nationwide Class, or in the Alternative, by Plaintiffs**
**on Behalf of Themselves and Their Corresponding State Subclass)**

376.  Plaintiffs replead and incorporate by reference Paragraphs 1-330 as if set forth herein.

377.  Under California law, every contract imposes on each party a duty of good faith and fair dealing in each performance and their enforcement. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to their form.

378.  Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

379.  Here, Plaintiffs and Defendants entered into a contract (implied in law, fact, or otherwise) whereby Defendants agreed to:

a. use a portion of the funds generated by Plaintiffs' and Class Members' transactions to pay for adequate cybersecurity measures;

  b. use adequate cybersecurity measures as required by state law, federal law, and Defendants' contractual agreements (implied or otherwise); and

  c. notify them promptly of any exposure of their Private Information.

380. As current and former customers, Plaintiffs and Class Members fully fulfilled their contractual obligations when they provided their Private Information to Defendants.

381. Furthermore, the conditions precedent (if any) to Defendants' performance have already occurred.

382. Defendants unfairly interfered with the Plaintiffs' and Class Members' rights to receive the benefits of the contract—and breached the covenant of good faith and fair dealing—by, inter alia:

  a. failing to safeguard Plaintiffs' and Class Members' information;

  b. failing to notify Plaintiffs and Class Members promptly of the intrusion into Defendants' computer systems that compromised such information.

  c. failing to comply with industry standards;

  d. failing to comply with their legal obligations; and

  e. failing to ensure the confidentiality and integrity of the electronic Private Information that Defendants created, received, maintained, and transmitted.

383. Defendants' material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries.

**COUNT VI**
**INVASION OF PRIVACY**
**(Against all Defendants by Plaintiffs on Behalf of Themselves**
**and the Nationwide Class, or in the Alternative, by Plaintiffs**
**on Behalf of Themselves and Their Corresponding State Subclass)**

384. Plaintiffs replead and incorporate by reference Paragraphs 1-330 as if set

forth herein.

385. Plaintiffs and Class Members have a reasonable expectation of privacy in the Private Information that Defendants disclosed without authorization.

386. By failing to keep Plaintiffs' and Class Members' Private Information safe, knowingly employing inadequate data privacy policies and protocols, and disclosing Private Information to unauthorized parties for unauthorized use, Defendants unlawfully invaded Plaintiffs' and Class Members' privacy by, *inter alia*:

    a. Intruding into Plaintiffs' and Class Members' private affairs in a manner that would be highly offensive to a reasonable person;

    b. Invading Plaintiffs' and Class Members' privacy by improperly using their Private Information properly obtained for a specific purpose for another purpose or disclosing it to some third-party;

    c. Failing to adequately secure Private Information from disclosure to unauthorized persons; and

    d. Enabling the disclosure of Plaintiffs' and Class Members' Private Information without consent.

387. Defendants knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiffs' and Class Members' position would consider their actions highly offensive.

388. Defendants knew that their IT systems and servers were vulnerable to data breaches prior to the Data Breach.

389. Defendants invaded Plaintiffs' and Class Members' right to privacy and intruded into Plaintiffs' and Class Members' private affairs by disclosing their Private Information to unauthorized persons without their informed, voluntary, affirmative, and clear consent.

390. As a proximate result of such unauthorized disclosures, Plaintiffs' and Class Members' reasonable expectations of privacy in their Private Information were unduly frustrated and thwarted. Defendants' conduct amounted to a serious invasion of

Plaintiffs' and Class Members' protected privacy interests.

391.    In failing to protect Plaintiffs' and Class Members' Private Information, and in disclosing Plaintiffs' and Class Members' Private Information, Defendants acted with malice and oppression and in conscious disregard of Plaintiffs' and Class Members' rights to have such information kept confidential and private.

392.    Plaintiffs seek injunctive relief on behalf of the Class, restitution, and all other damages available under this Count.

## COUNT VII
## UNJUST ENRICHMENT
**(Against all Defendants by Plaintiffs on Behalf of Themselves
and the Nationwide Class, or in the Alternative, by Plaintiffs
on Behalf of Themselves and Their Corresponding State Subclass)**

393.    Plaintiffs replead and incorporate by reference Paragraphs 1-330 as if set forth herein.

394.    This claim is pleaded in the alternative to the implied contract claim.

395.    Defendants have profited and benefited from the monies or fees paid and Personal Information provided by Plaintiffs and Class Members to receive services from Defendants.

396.    Defendants have voluntarily accepted and retained these profits and benefits with full knowledge and awareness that, as a result of the misconduct and omissions described herein, Plaintiffs and Class Members did not receive services of the quality, nature, fitness, or value represented by Defendants and that reasonable consumers expected.

397.    Defendants have been unjustly enriched by retaining and withholding these benefits at the expense of Plaintiffs and Class Members.

398.    Equity and justice are against permitting Defendants to retain these profits and benefits.

399.    Plaintiffs and Class Members suffered injury as a direct and proximate result of Defendants' unjust enrichment and seek an order directing Defendants to

CONSOLIDATED CLASS ACTION COMPLAINT                                                    74

disgorge these benefits and pay restitution to Plaintiffs and Class Members.

**COUNT VIII**
**DECLARATORY RELIEF**
**(Against all Defendants by Plaintiffs, on Behalf of Themselves
and the Nationwide Class, or in the Alternative, by Plaintiffs
on Behalf of Themselves and Their Corresponding State Subclass)**

400. Plaintiffs replead and incorporate by reference Paragraphs 1-330 as if set forth herein.

401. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

402. In the fallout of the Data Breach, an actual controversy has arisen about Defendants' various duties to use reasonable data security. On information and belief, Plaintiffs allege that Defendants' actions were—and still are—inadequate and unreasonable. And Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

403. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owed—and continue to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendants have a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendants breached, and continue to breach, their duties by failing to use reasonable measures to the data entrusted to it; and

d. Defendants' breach of their duties caused—and continue to cause— injuries to Plaintiffs and Class Members.

404. The Court should also issue corresponding injunctive relief requiring Defendants to use adequate security consistent with industry standards to protect the

data entrusted to them.

405.   If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendants experience a second data breach.

406.   And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs and Class Members' injuries.

407.   If an injunction is not issued, the resulting hardship to Plaintiffs and Class Members far exceeds the minimal hardship that Defendants could experience if an injunction is issued.

408.   An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

**COUNT IX**
**VIOLATIONS OF THE DRIVER'S PRIVACY PROTECTION ACT ("DPPA")**
**18 U.S.C. §§ 2721 *et seq.***
**(Against all Defendants by Plaintiffs on Behalf of**
**Themselves and the Nationwide Class)**

409.   Plaintiffs replead and incorporate by reference Paragraphs 1-330 as if set forth herein.

410.   The DPPA provides that "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains . . . ." 18 U.S.C. § 2724.

411.   The DPPA also restricts the resale and redisclosure of personal information and requires authorized recipients to maintain records of each individual and the permitted purpose of the disclosure for a period of five years. 18 U.S.C. § 2721(c).

412.   Under the DPPA, a "'motor vehicle record' means any record that pertains

to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C § 2725(1). Driver's license numbers are motor vehicle records and "personal information" under the DPPA. 18 U.S.C. § 2725(3).

413. Pursuant to the allegations herein, Defendants knew or should have known that they obtained, disclosed or re-disclosed, and used Private Information from a motor vehicle record for a purpose not permitted under the DPPA.

414. By engaging in the conduct described above, Defendants knowingly obtained personal information for a purpose not permitted under the DPPA.

415. By engaging in the conduct described above, Defendants knowingly used personal information for a purpose not permitted under the DPPA.

416. By engaging in the conduct described above, Defendants knowingly disclosed or re-disclosed personal information for a purpose nor permitted under the DPPA.

417. As a result of Defendants acquisition, use, subsequent Data Breach, and violations of the DPPA, Plaintiffs and Class Members are entitled to statutory damages to maximum allowable, actual damages, liquidated damages, and attorneys' fees and costs.

**COUNT X**
**BREACH OF CONFIDENCE**
**(Against all Defendants by Plaintiffs on Behalf of Themselves**
**and the Nationwide Class, or in the Alternative, by Plaintiffs**
**on Behalf of Themselves and their Corresponding State Subclass)**

418. Plaintiffs replead and incorporate by reference Paragraphs 1-330 as if set forth herein.

419. At all times during Plaintiffs' and Class Members' interactions with Defendants, Defendants were fully aware of the confidential and sensitive nature of Plaintiffs' and Class Members' Private Information it held.

420. Defendants' relationships with Plaintiffs and Class Members were

governed by terms and expectations that Plaintiffs' and Class Members' Private Information would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

421. Plaintiffs and Class Members provided their Private Information to Defendants with the explicit and implicit understanding that Defendants would protect and not permit the Private Information to be disseminated to any unauthorized third parties.

422. Plaintiffs and Class Members provided their Private Information to Defendants with the explicit and implicit understanding that Defendants would take reasonable and industry standard precautions to protect their Private Information from unauthorized disclosure.

423. Defendants voluntarily received in confidence Plaintiffs' and Class Members' Private Information with the understanding that Private Information would not be disclosed or disseminated to unauthorized third-parties or to the public.

424. Due to Defendants' failure to prevent or avoid the Data Breach, Plaintiffs' and Class Members' Private Information was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and Class Members' confidence, and without their express permission.

425. As a proximate result of such unauthorized disclosures, Plaintiffs and Class Members suffered damages.

426. But for Defendants' disclosure of Plaintiffs' and Class Members' Private Information in violation of the parties' understanding of confidence, their Private Information would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties.

427. The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendants' inadequate security of Plaintiffs' and Class Members' Private Information. Defendants knew or should have known that their methods of accepting, storing, transmitting, and using Plaintiffs' and Class Members'

Private Information were inadequate.

428. As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered injury, including but not limited to: (i) threat of identity theft; (ii) the loss of the opportunity in how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (v) the continued risk to their Private Information, which may remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect it; and (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the rest of Plaintiffs' and the class members' lives.

429. As a direct proximate result of such unauthorized disclosures, Plaintiffs and class members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

**B.    CALIFORNIA CLAIMS**

### COUNT XI
### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
#### Cal. Bus. & Prof. Code §§ 17200 *et seq.*
#### (Against all Defendants by Plaintiff Dawn Harris
#### on Behalf of Herself and the California Subclass)

430. Plaintiff repleads and incorporates by reference Paragraphs 1-330 as if set forth herein.

431. Defendants' conduct constitutes unfair, illegal, and fraudulent business practices within the meaning of the California Business & Professions Code §§ 17200 *et seq.* (the "UCL").

432. Defendants' conduct violated certain laws as alleged herein, including the

---

CONSOLIDATED CLASS ACTION COMPLAINT                                79

Federal Trade Commission Act (15 U.S.C. § 45), the Gramm-Leach-Bliley Act (15 U.S.C. §§ 6801 *et seq.*) ("GLBA"), and the Driver's Privacy Protection Act, 18 U.S.C. §§ 2724 *et seq.* ("DPPA). By engaging in the said conduct in the course of doing business within California, Defendants engaged in unlawful business practices in violation of the UCL as to Plaintiff and all Class Members.

433. By engaging in the above-described conduct in the course of doing business, Defendants engaged in unfair business practices in violation of the UCL because the harm to Plaintiff and Class Members outweighed any utility that Defendants' conduct may have produced.

434. Defendants' failure to disclose information concerning the Data Breach directly and promptly to affected customers constitutes a fraudulent act or practice in violation of the UCL. Defendants' failure to adequately protect Plaintiff's and Class Members' Private Information, despite assurances they would do so and that Defendants met industry standards for data security, also constitutes a fraudulent act or practice in violation of the UCL.

435. Plaintiff and Class Members suffered injury in fact as a result of Defendants' conduct.

436. Individually and on behalf of the Class, Plaintiff seeks injunctive relief, restitution, and all other damages available under this cause of action.

## COUNT XII
### VIOLATIONS OF THE CALIFORNIA CONSUMER PRIVACY ACT
#### Cal. Civ. Code §§ 1798.100 *et seq.*
**(Against all Defendants by Plaintiff Dawn Harris
on Behalf of Herself and the California Subclass)**

437. Plaintiff repleads and incorporates by reference Paragraphs 1-330 as if set forth herein.

438. Defendants violated California Civil Code § 1798.150 of the CCPA by failing to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the nonencrypted Private

Information of Plaintiff and the Class. As a direct and proximate result, Plaintiff's and the Class's nonencrypted and nonredacted Private Information was subject to unauthorized access and exfiltration, theft, or disclosure.

439. Defendants are each a "business" under the meaning of Civil Code § 1798.140 because Defendants are each a "corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners" that "collects consumers' personal information" and is active "in the State of California" and "had annual gross revenues in excess of twenty-five million dollars ($25,000,000) in the preceding calendar year." Civil Code § 1798.140(d).

440. Plaintiff and Class Members seek injunctive or other equitable relief to ensure Defendants hereinafter adequately safeguard Private Information by implementing reasonable security procedures and practices. Such relief is particularly important because Defendants continue to hold Private Information, including Plaintiff's and Class Members' Private Information. Plaintiff and Class Members have an interest in ensuring that their Private Information is reasonably protected, and Defendants have demonstrated a pattern of failing to adequately safeguard this information.

441. Pursuant to California Civil Code § 1798.150(b), Plaintiff mailed a CCPA notice letter to Defendants' registered service agents, detailing the specific provisions of the CCPA that Defendants have violated and continue to violate. Further, Plaintiff is informed and believes that Defendants already were put on notice via letter received on or about September 8, 2025 and have failed to cure their CCPA violations within 30 days. Therefore, waiting the statutory notice period for Plaintiff's letter before seeking damages would be futile.

442. As described herein, an actual controversy has arisen and now exists as to whether Defendants implemented and maintained reasonable security procedures and practices appropriate to the nature of the information so as to protect the Private Information under the CCPA. A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by

Defendants. Thus, Plaintiff seeks statutory damages and all other relief permitted by the CCPA.

## COUNT XIII
### VIOLATIONS OF THE CALIFORNIA CUSTOMER RECORDS ACT
Cal. Civ. Code §§ 1798.80 *et seq.*
(Against all Defendants by Plaintiff Dawn Harris
on Behalf of Herself and the California Subclass)

443. Plaintiff repleads and incorporates by reference Paragraphs 1-330 as if set forth herein.

444. Under the California Customer Records Act, any "person or business that conducts business in California, and that owns or licenses computerized data that includes personal information" must "disclose any breach of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82. The disclosure must "be made in the most expedient time possible and without unreasonable delay" but disclosure must occur "immediately following discovery [of the breach], if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Id. (emphasis added).

445. The Data Breach constitutes a "breach of the security system" of Defendants.

446. An unauthorized person acquired the personal, unencrypted information of Plaintiff and the Class.

447. Defendants knew that an unauthorized person had acquired the personal, unencrypted information of Plaintiff and the Class but waited until approximately August 22, 2025, to notify them. Given the severity of the Data Breach, this was an unreasonable delay.

448. Defendants' unreasonable delay prevented Plaintiff and the Class from taking appropriate measures to protect themselves against harm.

449. Because Plaintiff and the Class were unable to protect themselves, they suffered incrementally increased damages that they would not have suffered with timelier notice.

450. Plaintiff and the Class are entitled to equitable relief and damages in an amount to be determined at trial.

## COUNT XIV
## INVASION OF PRIVACY, CALIFORNIA CONSTITUTION, ART. 1 § 1
### (Against all Defendants by Plaintiff Dawn Harris
### on Behalf of Herself and the California Subclass)

451. Plaintiff repleads and incorporates by reference Paragraphs 1-330 as if set forth herein.

452. California established the right to privacy in Article I, Section 1 of the California Constitution.

453. Plaintiff and Class Members had a legitimate expectation of privacy to their Private Information and were entitled to the protection of this information against disclosure to unauthorized third parties.

454. Defendants owed a duty to their customers, including Plaintiff and Class Members, to keep their Private Information contained as a part thereof, confidential.

455. Defendants failed to protect and released Plaintiff's and Class Members' Private Information to unknown and unauthorized third parties.

456. Defendants allowed unauthorized and unknown third-parties access to and examination of Plaintiff's and Class Members' Private Information, by way of Defendants' failure to protect the Private Information.

457. The unauthorized release to, custody of, and examination by unauthorized third parties of Plaintiff's and Class Members' Private Information is highly offensive to a reasonable person.

458. The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiff and Class Members disclosed their Private Information to Defendants as part of seeking insurance services from Defendant, but privately with an

intention that the Private Information would be kept confidential and would be protected from unauthorized disclosure. Plaintiff and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

459. The Data Breach at the hands of Defendants constitutes an intentional interference with Plaintiff's and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

460. Defendants acted with a knowing state of mind when they permitted the Data Breach to occur because they were with actual knowledge that their information security practices were inadequate and insufficient.

461. Because Defendants acted with a knowing state of mind, they had notice that their inadequate and insufficient information security practices would cause injury and harm to Plaintiff and Class Members.

462. As a proximate result of the above acts and omissions of Defendants, Plaintiff's and Class Members' Private Information was disclosed to third parties without authorization, causing Plaintiff and Class Members to suffer damages.

463. Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that the Private Information maintained by Defendants can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and Class Members.

## C.    MICHIGAN CLAIMS

### COUNT XV
**VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT**
Mich. Comp. Laws §§ 445.903 *et seq.*
(Against all Defendants by Plaintiff Michael McCulloch
on Behalf of Himself and the Michigan Subclass)

464.   The Michigan Plaintiff identified above ("Plaintiff" for purposes of this Count), individually and on behalf of the Michigan Subclass, repleads and incorporates by reference Paragraphs 1-330 as if set forth herein.

465.   Defendants and Michigan Subclass Members are "persons" as defined by Mich. Comp. Laws § 445.902(d).

466.   Defendants advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws § 445.903(g).

467.   Defendants engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws § 445.903(1), including:

    a. Representing that their goods and services have characteristics, uses, and benefits that they do not have;

    b. Representing that their goods and services are of a particular standard or quality if they are of another;

    c. Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;

    d. Making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;

    e. Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive matter.

CONSOLIDATED CLASS ACTION COMPLAINT                                      85

468.  Defendants' unfair, unconscionable, and deceptive practices include:

a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Michigan Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

b.  Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Michigan Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d.  Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Michigan Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Michigan Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Michigan Subclass Members' Private Information; and

g.  Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Michigan Subclass Members'

CONSOLIDATED CLASS ACTION COMPLAINT                                    86

Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

469. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

470. Defendants intended to mislead Plaintiff and Michigan Subclass Members and induce them to rely on their misrepresentations and omissions.

471. Defendants acted intentionally, knowingly, and maliciously to violate Michigan's Consumer Protection Act, and recklessly disregarded Plaintiff's and Michigan Subclass Members' rights. Defendants' numerous past data breaches put them on notice that their security and privacy protections were inadequate.

472. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive practices, Plaintiff and Michigan Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to one or more of the following: (i) ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (ii) actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (iii) loss of the value of their privacy and the confidentiality of the stolen Private Information; (iv) illegal sale of the compromised Private Information on the black market; (v) mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; (vi) time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; (vii) expenses and time spent initiating fraud alerts; (viii) decreased credit scores and ratings; (ix) lost work time; (x) lost value of Private Information; (xi) lost value of access to Private Information permitted by Defendants; (xii) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of

Defendants' Data Breach; (xiii) lost benefits of bargains as well as overcharges for services or products; (xiv) nominal and general damages; and (xv) other economic and non-economic harm.

473. Plaintiff and Michigan Subclass Members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $250, injunctive relief, and any other relief that is just and proper.

**D.      NEBRASKA CLAIMS**

**COUNT XVI**
**VIOLATIONS OF THE NEBRASKA CONSUMER PROTECTION ACT**
**Neb. Rev. Stat. §§ 59-1601 *et seq.***
**(Against all Defendants by Plaintiff Phyllis Garrison**
**on Behalf of Herself and the Nebraska Subclass)**

474. Plaintiff, on behalf of herself and the Nebraska Subclass, ("Plaintiff" for purposes of this Count), repleads and incorporates by reference Paragraphs 1-330 as if set forth herein.

475. Defendants and Nebraska Subclass Members are each a "person" as defined by Neb. Rev. Stat. § 59-1601(1).

476. Defendants advertised, offered, or sold goods or services in Nebraska and engaged in trade or commerce directly or indirectly affecting the people of Nebraska, as defined by Neb. Rev. Stat. § 59-1601.

477. Defendants engaged in unfair and deceptive acts and practices in conducting trade and commerce, in violation of Neb. Rev. Stat. § 59-1602, including:

      a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

      b. Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and

proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Subclass Members' Private Information; and

g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

478.  Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

479.  As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and Nebraska Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-

CONSOLIDATED CLASS ACTION COMPLAINT                                        89

monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment for Defendants' services; loss of the value of access to their Private Information; and the value of identity protection services made necessary by the Breach.

480.    Defendants' unfair and deceptive acts and practices complained of herein affected the public interest, including the large percentage of Nebraskans affected by the Defendants' Data Breach.

481.    Plaintiff and Nebraska Subclass Members seek all monetary and non-monetary relief allowed by law, including, pursuant to Neb. Rev. Stat. Ann. § 59-1609, injunctive relief, the greater of either (1) actual damages or (2) $1,000, civil penalties, and reasonable attorneys' fees and costs.

**COUNT XVII**
**VIOLATIONS OF THE NEBRASKA**
**UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**Neb. Rev. Stat. §§ 87-301 *et seq.***
**(Against all Defendants by Plaintiff Phyllis Garrison**
**on Behalf of Herself and the Nebraska Subclass)**

482.    Plaintiff, on behalf of the Nebraska Subclass, ("Plaintiff," for purposes of this Count), repleads and incorporates by reference Paragraphs 1-330 as if set forth herein.

483.    Defendants and Nebraska Subclass Members are "persons" as defined by Neb. Rev. Stat. § 87-301(19).

484.    Defendants advertised, offered, or sold goods or services in Nebraska and engaged in trade or commerce directly or indirectly affecting the people of Nebraska.

485.    Defendants engaged in deceptive trade practices in the course of their business, in violation of Neb. Rev. Stat. § 87-302(a), including:

a.    Representing that goods and services have characteristics, uses,

benefits, or qualities that they do not have;

b. Representing that goods and services are of a particular standard, quality, or grade if they are of another; and

c. Advertising their goods and services with intent not to sell them as advertised and in a manner calculated or tending to mislead or deceive.

486. Defendants' deceptive trade practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Subclass Members' Private Information; and

g.  Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

487.  Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

488.  Defendants intended to mislead Plaintiff and Nebraska Subclass Members and induce them to rely on their misrepresentations and omissions.

489.  Had Defendants disclosed to Plaintiff and Subclass Members that their data systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business, and they would have been forced to adopt reasonable data security measures and comply with the law. Defendants were trusted with sensitive and valuable Private Information regarding millions of consumers, including Plaintiff and the Subclass. Defendants accepted the responsibility of protecting the data while keeping the inadequate state of their security controls secret from the public. Accordingly, Plaintiff and the Subclass Members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

490.  Defendants acted intentionally, knowingly, and maliciously to violate Nebraska's Uniform Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Nebraska Subclass Members' rights. Defendants' numerous past data breaches put them on notice that their security and privacy protections were inadequate.

491.  As a direct and proximate result of Defendants' deceptive trade practices,

Plaintiff and Nebraska Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment for Defendants' services; loss of the value of access to their Private Information; and the value of identity protection services made necessary by the Breach.

492. Defendants' deceptive trade practices complained of herein affected consumers at large, including the large percentage of Nebraskans affected by the Defendants' Data Breach.

493. Plaintiff and Nebraska Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, civil penalties, and attorneys' fees and costs.

**E.     NEW JERSEY CLAIMS**

**COUNT XVIII**
**VIOLATIONS OF THE NEW JERSEY**
**CUSTOMER SECURITY BREACH DISCLOSURE ACT**
**N.J. Stat. Ann. §§ 56:8-163 *et seq*.**
**(Against all Defendants by Plaintiff Christina Scorio on**
**Behalf of Herself and the New Jersey Subclass)**

494. The New Jersey Plaintiff identified above ("Plaintiff" for purposes of this Count), individually and on behalf of the New Jersey Subclass, repleads and incorporates by reference Paragraphs 1-330 as if set forth herein.

495. Defendants are businesses that compile or maintain computerized records that includes Private Information, on behalf of another business under N.J. Stat. Ann. § 56:8-163(b).

496. Plaintiff's and New Jersey Subclass Members' Private Information (including names, addresses, and Social Security numbers) includes Private Information

CONSOLIDATED CLASS ACTION COMPLAINT                                          93

covered under N.J. Stat. Ann. §§ 56:8-163 *et seq.*

497.   Under N.J. Stat. Ann. § 56:8-163(b), "[a]ny business . . . that compiles or maintains computerized records that include personal information on behalf of another business or public entity shall notify that business or public entity, who shall notify its New Jersey customers . . . of any breach of security of the computerized records immediately following discovery, if the personal information was, or is reasonably believed to have been, accessed by an unauthorized person."

498.   Because Defendants discovered a breach of their security system in which Private Information was, or is reasonably believed to have been, acquired by an unauthorized person and the Private Information was not secured, Defendants had an obligation to disclose the Defendants' Data Breach in a timely and accurate fashion as mandated under N.J. Stat. Ann. §§ 56:8-163 *et seq.*

499.   By failing to disclose the Data Breach in a timely and accurate manner, Defendants violated N.J. Stat. Ann. § 56:8-163(b).

500.   As a direct and proximate result of Defendants' violations of N.J. Stat. Ann. § 56:8-163(b), Plaintiff and New Jersey Subclass Members suffered the damages described above.

501.   Plaintiff and New Jersey Subclass Members seek relief under N.J. Stat. Ann. § 56:8-19, including treble damages, attorneys' fees and costs, and injunctive relief.

**COUNT XIX**
**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
**N.J. Stat. Ann. §§ 56:8-1 *et seq.***
**(Against all Defendants by Plaintiff Christina Scorio**
**on Behalf of Herself and the New Jersey Subclass)**

502.   The New Jersey Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the New Jersey Subclass, repleads and incorporates by reference Paragraphs 1-330 as if set forth herein.

503.   Defendants are "person[s]," as defined by N.J. Stat. Ann. § 56:8-1(d).

504. Defendants sell "merchandise," as defined by N.J. Stat. Ann. § 56:8-1(c) & (e).

505. The New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-2, prohibits unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, as well as the knowing concealment, suppression, or omission of any material fact with the intent that others rely on the concealment, omission, or fact, in connection with the sale or advertisement of any merchandise.

506. Defendants' unconscionable and deceptive practices include:

   a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and New Jersey Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

   b. Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

   c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and New Jersey Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

   d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and New Jersey Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

   e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and New Jersey Subclass Members' Private Information, including

duties imposed by the FTC Act, 15 U.S.C. § 45;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and New Jersey Subclass Members' Private Information; and

g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and New Jersey Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

507. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

508. Defendants intended to mislead Plaintiff and New Jersey Subclass Members and induce them to rely on their misrepresentations and omissions.

509. Defendants acted intentionally, knowingly, and maliciously to violate New Jersey's Consumer Fraud Act, and recklessly disregarded Plaintiff's and New Jersey Subclass Members' rights. Moreover, Defendants' numerous past data breaches put them on notice that their security and privacy protections were inadequate.

510. As a direct and proximate result of Defendants' unconscionable and deceptive practices, Plaintiff and New Jersey Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to one or more of the following: (i) ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (ii) actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (iii) loss of the value of their privacy and the confidentiality of the stolen Private Information; (iv) illegal sale of the compromised Private Information on the black market; (v) mitigation expenses and time spent on credit monitoring, identity theft

insurance, and credit freezes and unfreezes; (vi) time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; (vii) expenses and time spent initiating fraud alerts; (viii) decreased credit scores and ratings; (ix) lost work time; (x) lost value of Private Information; (xi) lost value of access to Private Information permitted by Defendants; (xii) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendants' Data Breach; (xiii) lost benefits of bargains as well as overcharges for services or products; (xiv) nominal and general damages; and (xv) other economic and non-economic harm.

511. Plaintiff and New Jersey Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, actual damages, treble damages, restitution, and attorneys' fees, filing fees, and costs.

**F.     PENNSYLVANIA CLAIMS**

**COUNT XX**
**VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**73 a. Cons. Stat. §§ 201-2 *et seq*.**
**(Against all Defendants by Plaintiff Bobbie Jo Geelen**
**on Behalf of Herself and the Pennsylvania Subclass)**

512. The Pennsylvania Plaintiff identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Pennsylvania Subclass, replead and incorporate by reference Paragraphs 1-330 as if set forth herein.

513. Defendants are "person[s]," as meant by 73 Pa. Cons. Stat. § 201-2(2).

514. Plaintiff and Pennsylvania Subclass Members purchased goods and services in "trade" and "commerce," as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes.

515. Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of their trade and commerce in violation of 73

Pa. Cons. Stat. § 201-3, including the following:

a. Representing that their goods and services have approval, characteristics, uses, or benefits that they do not have (73 Pa. Cons. Stat. § 201-2(4)(v));

b. Representing that their goods and services are of a particular standard or quality if they are another (73 Pa. Cons. Stat. § 201- 2(4)(vii)); and

c. Advertising their goods and services with intent not to sell them as advertised (73 Pa. Cons. Stat. § 201-2(4)(ix)).

516.   Defendants' unfair or deceptive acts and practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Pennsylvania Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Pennsylvania Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Pennsylvania Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that they would comply with common law and

statutory duties pertaining to the security and privacy of Plaintiff's and Pennsylvania Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff's and Pennsylvania Subclass Members' Private Information; and

g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Pennsylvania Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

517. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

518. Defendants intended to mislead Plaintiff and Pennsylvania Subclass Members and induce them to rely on their misrepresentations and omissions.

519. Had Defendants disclosed to Plaintiff's and Pennsylvania Subclass Members that their data systems were not secure and, thus, vulnerable to attack, Defendants would have been forced to adopt reasonable data security measures and comply with the law. Defendants were trusted with sensitive and valuable Private Information regarding millions of consumers, including Plaintiff and the Pennsylvania Subclass. Defendants accepted the responsibility of protecting the data while keeping the inadequate state of their security controls secret from the public. Accordingly, Plaintiff and the Pennsylvania Subclass Members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

520. Defendants acted intentionally, knowingly, and maliciously to violate Pennsylvania Unfair Trade Practices and Consumer Protection Law, and recklessly

CONSOLIDATED CLASS ACTION COMPLAINT                                    99

disregarded Plaintiff and Pennsylvania Subclass Members' rights. Defendants' numerous past data breaches put them on notice that their security and privacy protections were inadequate.

521. As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices and Plaintiff's and the Pennsylvania Subclass' reliance on them, Plaintiff and Pennsylvania Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to one or more of the following: (i) ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (ii) actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (iii) loss of the value of their privacy and the confidentiality of the stolen Private Information; (iv) illegal sale of the compromised Private Information on the black market; (v) mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; (vi) time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; (vii) expenses and time spent initiating fraud alerts; (viii) decreased credit scores and ratings; (ix) lost work time; (x) lost value of Private Information; (xi) lost value of access to Private Information permitted by Defendants; (xii) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendants' Data Breach; (xiii) lost benefits of bargains as well as overcharges for services or products; (xiv) nominal and general damages; and (xv) other economic and non-economic harm.

522. Plaintiff and Pennsylvania Subclass Members seek all monetary and non-monetary relief allowed by law, including, pursuant to 73 Pa. Cons. Stat. § 201-9.2, actual damages or statutory damages of $100 (whichever is greater), treble damages, attorneys' fees and costs, and any additional relief the Court deems necessary or proper.

## G. TEXAS CLAIMS

### COUNT XXI
### VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES–CONSUMER PROTECTION ACT,
Texas Bus. & Com. Code §§ 17.41 *et seq.*
(Against all Defendants by Plaintiffs Roland Plude,
Josko Smolcic, and Jacqulyn McGlynn on Behalf of
Themselves and the Texas Subclass)

523. The Texas Plaintiffs identified above ("Plaintiffs," for purposes of this Count), individually and on behalf of the Texas Subclass, Plaintiffs replead and incorporate by reference Paragraphs 1-330 as if set forth herein.

524. Defendants are "person[s]," as defined by Tex. Bus. & Com. Code § 17.45(3).

525. Plaintiffs and the Texas Subclass Members are "consumers," as defined by Tex. Bus. & Com. Code § 17.45(4).

526. Defendants advertised, offered, or sold goods or services in Texas and engaged in trade or commerce directly or indirectly affecting the people of Texas, as defined by Tex. Bus. & Com. Code § 17.45(6).

527. Defendants engaged in false, misleading, or deceptive acts and practices, in violation of Tex. Bus. & Com. Code § 17.46(b), including:

      a. Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

      b. Representing that goods or services are of a particular standard, quality or grade, if they are of another; and

      c. Advertising goods or services with intent not to sell them as advertised;

      d. Failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a

transaction into which the consumer would not have entered had the information been disclosed.

528. Defendants' false, misleading, and deceptive acts and practices include:

    a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

    b. Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Texas's data security statute, Tex. Bus. & Com. Code § 521.052, which was a direct and proximate cause of the Data Breach;

    d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs' and Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

    e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Texas's data security statute, Tex. Bus. & Com. Code § 521.052;

    f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Subclass Members'

Private Information; and

g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Texas's data security statute, Tex. Bus. & Com. Code § 521.052.

529. Defendants intended to mislead Plaintiffs and Texas Subclass Members and induce them to rely on their misrepresentations and omissions.

530. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

531. Had Defendants disclosed to Plaintiffs and Subclass Members that their data systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business, and they would have been forced to adopt reasonable data security measures and comply with the law. Defendants were trusted with sensitive and valuable Private Information regarding millions of consumers, including Plaintiffs and the Subclass. Defendants accepted the responsibility of protecting the data while keeping the inadequate state of their security controls secret from the public. Accordingly, Plaintiffs and the Subclass Members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

532. Defendants had a duty to disclose the above facts due to the circumstances of this case, the sensitivity and extensivity of the Private Information in their possession, and the generally accepted professional standards. Such a duty is implied by law due to the nature of the relationship between consumers, including Plaintiffs and the Texas Subclass, and Defendants because consumers are unable to fully protect their interests with regard to their data, and placed trust and confidence in Defendants. Defendants'

duty to disclose also arose from their:

   a. Possession of exclusive knowledge regarding the security of the data in their systems;

   b. Active concealment of the state of their security; and/or

   c. Incomplete representations about the security and integrity of its computer and data systems, and their prior data breaches, while purposefully withholding material facts from Plaintiffs and the Texas Subclass that contradicted these representations.

533. Defendants engaged in unconscionable actions or courses of conduct, in violation of Tex. Bus. & Com. Code Ann. § 17.50(a)(3). Defendants engaged in acts or practices which, to consumers' detriment, took advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

534. Consumers, including Plaintiffs and Texas Subclass Members, lacked knowledge about deficiencies in Defendants' data security because this information was known exclusively by Defendants. Consumers also lacked the ability, experience, or capacity to secure the Private Information in Defendants' possession or to fully protect their interests with regard to their data. Plaintiffs and Texas Subclass Members lack expertise in information security matters and do not have access to Defendants' systems in order to evaluate their security controls. Defendants took advantage of their special skill and access to Private Information to hide their inability to protect the security and confidentiality of Plaintiffs and Texas Subclass Members' Private Information.

535. Defendants intended to take advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree, with reckless disregard of the unfairness that would result. The unfairness resulting from Defendants' conduct is glaringly noticeable, flagrant, complete, and unmitigated. The Data Breach, which resulted from Defendants' unconscionable business acts and practices, exposed Plaintiffs and Texas Subclass Members to a wholly unwarranted risk to the safety of their Private Information and the security of their identity or credit, and worked a

substantial hardship on a significant and unprecedented number of consumers. Plaintiffs and Texas Subclass Members cannot mitigate this unfairness because they cannot undo the Data Breach.

536. Defendants acted intentionally, knowingly, and maliciously to violate Texas's Deceptive Trade Practices-Consumer Protection Act, and recklessly disregarded Plaintiffs and Texas Subclass Members' rights. Defendants' numerous past data breaches put them on notice that their security and privacy protections were inadequate.

537. As a direct and proximate result of Defendants' unconscionable and deceptive acts or practices, Plaintiffs and Texas Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment for Defendants' services; loss of the value of access to their Private Information; and the value of identity protection services made necessary by the Breach. Defendants' unconscionable and deceptive acts or practices were a producing cause of Plaintiffs' and Texas Subclass Members' injuries, ascertainable losses, economic damages, and non-economic damages, including their mental anguish. Defendants' violations present a continuing risk to Plaintiffs and Texas Subclass Members as well as to the general public.

538. Plaintiffs and the Texas Subclass seek all monetary and non-monetary relief allowed by law, including economic damages; damages for mental anguish; treble damages for each act committed intentionally or knowingly; court costs; reasonably and necessary attorneys' fees; injunctive relief; and any other relief which the court deems proper.

## VIII. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of themselves and the proposed Classes, respectfully request relief as follows:

A.  An order certifying this action as a class action, and certifying the Classes defined herein, designating Plaintiffs as the representatives of the respective Classes defined herein;

B.  An order declaring that Defendants' actions, as described above constitute negligence and violations of the state data security and privacy statutes set forth above, and that Defendants were unjustly enriched as a result of their actions;

C.  A judgment awarding Plaintiffs and the Members of the Classes appropriate relief, including actual, compensatory, and/or statutory damages, and punitive damages (as permitted by law), in an amount to be determined at trial;

D.  A judgment awarding any and all equitable, injunctive, and declaratory relief as may be appropriate, including orders of disgorgement of Defendants' unlawful gains, and restitution;

E.  A judgment awarding injunctive relief as set forth above, non-restitutionary disgorgement of profits and unlawful gains, and such other equitable relief as the Court may deem proper;

F.  A judgment awarding all costs, including experts' fees, attorneys' fees, and the costs of prosecuting this action, and other relief as permitted by law;

G.  Pre-judgment and post-judgment interest, as permitted by law; and

H.  Grant such other legal and equitable relief as the Court may deem appropriate.

## IX. <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury for all issues so triable.

Dated: May 1, 2026

Respectfully submitted,

By: _/s/ Tina Wolfson_
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Ave. Suite 500
Burbank, CA 91505
T: (310) 474-9111

Thomas E. Loeser (SBN 202724)
tloeser@cpmlegal.com
**COTCHETT PITRE & MCCARTHY, LLP**
2716 Ocean Park Blvd, Suite 3088
Santa Monica, CA 90405
T: (310) 392-2008

_Co-Lead Interim Class Counsel_